James P. GALVIN and Kathleen M. Galvin

v.

Elizabeth GAFFNEY.

No. CIV. 3:95CV1081(WWE).

United States District Court, D. Connecticut.

June 9, 1998.

Robert Joseph Piscitelli, Kantor, Mickelson & Meyers, Avon, Robert G. Skelton, New Haven, CT, for James P. Galvin, Kathleen M. Galvin, plaintiffs.

Donald A. Mitchell, Law Firm of Donald A. Mitchell, Danbury, CT, for Elizabeth Gaffney, defendant.

## RULING

FITZSIMMONS, United States Magistrate Judge.

On June 8, 1995, James P. Galvin and Kathleen M. Galvin, the owners of property in New Milford, filed a complaint to prevent defendant's interference with plaintiffs' lawful use of an easement, and seeking confirmation of their right to install utility lines across defendant's property to serve their residence. By agreement of the parties,[1] a trial on the merits was bifurcated, with the first stage limited to determining the existence and scope of an easement by deed.[2]

This ruling addresses issues previously reserved for the second stage of this litigation. The questions before the Court are whether an easement created in the 1802 deed from Buck to Phelps, and later extinguished upon unity of ownership of the dominant and servient estates in 1810, was newly created by implication or necessity upon the severance of the servient and dominant estates in 1826, or created by prescription during the inter-

vening years since. If so, the Court must decide the scope of that easement.

Evidence was heard on January 7 and 9, 1998; James Galvin testified for the plaintiffs and Attorney Peter Ruvuolo, a title searcher, for the defendant. Proposed findings of fact and conclusions of law[3] were filed on February 20 and final argument was held on April 27, 1998.

Testimony and evidence adduced at the hearing are summarized below as necessary to explain the Court's findings and conclusions.

## FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the entire record compiled during the first stage of the litigation and the hearings on January 7 and 9, 1998, the Court finds the following facts established which are relevant to this ruling.

## PARTIES

1. James and Kathleen Galvin reside at 178 Indian Trail Road, New Milford, Connecticut. [Compl. 1].

2. Defendant Elizabeth Gaffney resides at 440–60 Elbertson Street, Elmhurst, New York. [Compl. 2, Answ. 2].

### The Servient Estate

3. Mrs. Gaffney is the owner of the "servient estate" created when Samuel Buck conveyed a portion of his land, including the "passway" parcel, to Luke Hallock in 1802. [Doc. # 62 ¶ 23].

4. Defendant acquired her interest in the servient estate on September 7, 1945, by virtue of two deeds, one from the Estate of McGraw and the other from Nathan McGraw. [Doc. # 62 ¶ 24].

---

1. The parties agreed to consolidate the motions with a trial on the merits on February 5, 1996. [Endorsement ruling to Doc. # 3].

2. The first stage of this litigation addressed four issues: (1) whether plaintiffs had standing to bring an action; (2) whether an easement created by a deed from Samuel Buck to Luke Hallock on February 15, 1802 was appurtenant or in

gross; (3) whether that easement was extinguished upon unity of title; and (4) whether that easement revived upon re-severance of the united parcels. A ruling issued on March 24, 1997. [Doc. # 46].

3. Doc.è57, 58, 59, 60, 61, 62.

*The Dominant Estate*

*The 1802 Deed*

5. All of the land referred to in this case was originally part of the "Northpurchase," land purchased from the native inhabitants of the New Milford area and sold and confirmed by the committees of Hartford and Windsor to the proprietors of the tract by an act of the governor and company of the colony of Connecticut on October 2, 1731 and by act of the General Court on October 18, 1731. [Doc. # 46 ¶ 3, Doc. # 62 ¶ 1].

6. The original proprietors then laid out the Northpurchase into a series of "lots," with "highways" designated in the plan so that each of the lots had access to the planned public road system. [Doc. # 62 ¶ 2].

7. The proprietors thereafter sold these lots to private individuals by reference to the "layout" and to the "highways." [Doc. # 62 ¶ 3].

8. The 57th lot, as created by the proprietors, was conveyed to one Daniel Nobel, being described in the conveyance as " ... lying in the south tear .... Beginning at the fifty sixth lot and running one hundred and eighty one rods Bounded north and south on the highway and west upon the fifty eighth lot." The highway on the north boundary of the 57th lot is referred to as the "ten rod highway." [Doc. # 62 ¶ 4].

9. All of the parcels of land involved in this action were once part of the 57th lot. [Doc. # 62 ¶ 5].

10. Prior to February 15, 1802, Samuel Beebe Buck owned an irregularly shaped piece of land situated in the 57th lot of the Northpurchase in the Town of New Milford. [Doc. # 46 ¶ 4, Doc. # 59 at 1, Doc. # 62 ¶ 7].

11. Buck's land was entirely surrounded by land of other private landowners, except for a portion 6 rods wide and 32 rods long which abutted a road (now Indian Trail Road) to the south, and which provided access to the remainder of Buck's property. This 6 × 32 rod portion is referred to as the "passway". [Doc. # 46 ¶ 5, Doc. # 59 at 1, Doc. # 62 ¶ 8].

12. On February 15, 1802, Samuel Buck deeded to Luke Hallock a part of Samuel's property located on Indian Trail Road. (This was the western portion of his land, including the passway, now owned by the defendant.) [Doc. # 46 ¶ 6, Doc. # 59 at 1, Doc. # 62 ¶ 9].

13. The deed specifically provided that Buck "reserve to myself and heirs ... the right of passing occasionally to and from other lands ..." (hereinafter "passway rights"). [Doc. # 46 ¶ 7, Doc. # 59 at 2, Doc. # 62 ¶ 10].

14. Buck's "other lands" consisted of approximately 25 acres of land adjacent to the piece that he sold to Luke Hallock, now the Galvin estate. These "other lands" were landlocked, except for the passway rights reserved by Buck. [Doc. # 46 ¶ 8, Doc. # 59 ¶ 5, Doc. # 62 ¶ 11].

15. The passway rights reserved by Samuel Buck were appurtenant to the land that Buck retained because, without them, Buck had no access to the public road system. His retained property was bounded entirely by other private property owners. Therefore, the reservation was necessary to maintain the value of his retained land. [Doc. # 46 ¶ 9, Doc. # 59 at 2].

16. On that same day, February 15, 1802, Buck conveyed his "other lands" (Galvin Estate) by quit claim deed to William Phelps. The deed included " ... a privilege of passing south to and from the highway in the old passway so called." [Doc. # 46 ¶ 10, Doc. # 59 at 2, Doc. # 62 ¶ 12].

17. At the time of the Buck conveyance to Phelps, Phelps already owned a parcel of land between Buck's land [the Galvin estate] and the "Ten Rod Highway" to its north. [Doc. # 46 ¶ 11, Doc. 59 at 3, Doc. # 62 ¶ 13].

18. As a result of the conveyance from Buck, Phelps owned a parcel of land that bounded to its north the "Ten Rod Highway", as laid out by the proprietors of the Northpurchase. Phelps had direct access from the dominant/Galvin estate to the land designated by the original proprietors as the "Ten Rod Highway." [Doc. # 62 ¶¶ 14, 15].

*The Ten Rod Highway*

19. The "Ten Rod Highway" referred to in various deeds was never built; it was only a "paper" highway, the property for which had

been sold off to private land owners before 1802. [Doc. # 46 ¶ 12, Doc. # 59 at 3].

20. The northern portion of the plaintiffs' property, described as Ten Rod Highway on the Hart Map, has never been used as a roadway. [Doc. # 59 at 3; Ex. 24].

21. The property to the east and west of plaintiffs' property along the northern boundary identified as Ten Rod Highway yields no physical evidence that it has ever been used as a roadway, has a steep grade and is impassable by automobile. [Doc. # 59 at 3].

22. The passway, originally created when Samuel, James and Asaph Buck split their holdings, would not have been necessary if Ten Rod Highway were an actual access route to the property retained by James and Asaph. [Doc. # 59 at 4, 3/29/96 Tr. at 79–82].

23. When Asaph Buck and James Buck split their holdings prior to 1802, Asaph retained a right to pass over the passway, which right would not have been necessary had Ten Rod Highway been an actual access route to Asaph's retained property. [Doc. # 59 at 4].

24. Portions of Ten Rod Highway had been conveyed by the Town of New Milford to private landowners prior to 1802. [Doc. # 59 at 4–5].

25. In 1815, the Town of New Milford conveyed a portion of Ten Rod Highway to Joseph and Amos Hallock, part of which became incorporated in plaintiffs' property. [Doc. # 59 at 5].

*The Two–Rod Strip*

26. The two-rod wide strip created in the 1802 Buck to Phelps deed was carved out specifically to connect the plaintiffs' property to the passway. [Doc. # 59 at 5].

27. The 1826 severance deed between Joseph and Amos Hallock references the two-rod strip which is now part of the plaintiffs' parcel. [Doc. # 59 at 5].

28. The two-rod strip connects to the six-rod passway. [Doc. # 59 at 5].

29. The two-rod strip retained by Joseph and Amos Hallock in the 1826 severance deed provides the dominant/Galvin estate with access to the passway and thereby to Indian Trail Road. [Doc. # 59 at 5].

*1805*

30. On April 27, 1805, Luke Hallock conveyed all of his interest in the land that he received from Samuel Buck to Joseph D. and Amos Hallock, including the "passway" parcel (the servient/Gaffney estate). [Doc. # 62 ¶ 18].

*1810*

31. On March 5, 1810, William Phelps conveyed all of his interest in the land that he received from Samuel Buck (the Galvin estate), along with his interest in the adjacent piece of land to the north that he had acquired from Elijah Stone, to Joseph D. and Amos Hallock. [Doc. # 62 ¶ 19].

*1824*

32. In 1824, Amos Hallock quit claimed his interest in the land that he and Joseph D. Hallock received from Luke Hallock, including the passway piece, to Joseph D. Hallock, with all appurtenances thereof. The land so conveyed included the original Buck–to–Hallock land and other lands. [Doc. # 62 ¶ 20].

33. In 1824, Joseph D. and Amos Hallock conveyed a portion of their property known as the "Buck Swamp Parcel" to Jessie Hallock, giving Jessie Hallock the "privilege of passing and repassing" over the passway to the highway. (Ex. 6). This was the same passway referred to in the 1802 deed from Buck to Phelps. [Doc. # 59 at 6].

34. At the time of the 1824 transfer, Jessie Hallock owned adjacent property with access to a public road. The easement over the passway to Jessie Hallock for the Buck Swamp Parcel was only necessary if that parcel were treated as a separate parcel and thus landlocked, or if Jessie's other land were physically inaccessible. [Doc. # 59 at 6–7].

*The 1826 Deed: Severance*

35. In 1826, Amos Hallock and Joseph Hallock severed their jointly held property, with

Joseph retaining the defendant's parcel (Ex. 7), and Amos and Joseph owning the plaintiffs' parcel. (Ex. 7). [Doc. # 59 at 7].

36. As of 1826, portions of Ten Rod Highway to the west of the plaintiff's property had been conveyed to the Town of New Milford and to private landowners (Ex. 26), and portions of Ten Rod Highway to the east of plaintiffs' property had been conveyed to private landowners. (Ex. 27). [Doc. # 59 at 7].

37. The conveyance from Amos Hallock to Joseph Hallock was made with "reservation of all appurtenances thereto." [Doc. # 59 at 8].

38. After the transfer in 1826, the only access for Amos Hallock to the jointly held property (dominant/Galvin estate) was over the passway. [Doc. # 59 at 8].

39. In 1831, a mortgage deed from Joseph and Amos Hallock to Mary Boardman in 1831 refers to "appurtenances." This was the first deed executed after the 1826 Severance Deed. [Doc. # 59 at 5, Howland Tr. 3/29/96 at 152].

### The 1837 Deed

40. The 1837 transfer of the dominant/Galvin estate (including a portion of Ten Rod Highway) by Joseph and Amos Hallock to the Ousatonic Iron Company included all "appurtenances." [Doc. # 59 at 9, Doc. # 62 ¶ 21].

41. Without the right to pass and repass over the passway, Ousatonic Iron Company's property would have been landlocked and without access to a highway. [Doc. # 59 at 9].

### Boardmans 1837–1881

42. The Mortgage Deed from Ousatonic Iron Company to Mary Boardman dated and recorded July 10, 1837, in Volume 37 at Page 595 of the New Milford Land Records conveyed all "appurtenances". [Ex. 11].

43. The Order of Distribution from Mary A. Boardman to William W. Boardman dated March 14, 1850, recorded in Volume 15 at Page 344 of the New Milford Probate Records, included any easements appurtenant to the property. [Ex. 12, Doc. # 59 at 9].

44. The Will of William W. Boardman dated 1871, devising to Cornelia E. Boardman all of William Boardman's land situated in the Town of New Milford, included any easements appurtenant to the property. [Ex. 14,15, Doc. # 59 at 9–10].

### Schroeders 1881–1920

45. The Order of Distribution of real estate from Cornelia E. Boardman to John F. Schroeder and Henry H. Schroeder dated March 28, 1881 and recorded March 28, 1881 in Volume 56 at Page 135 of the New Milford Land Records included any easements appurtenant to the dominant estate. [Ex. 16, Doc. # 59 at 10].

46. The Warranty Deed from Henry H. Schroeder to John F. Schroeder dated January 28, 1885 and recorded September 22, 1890 in Volume 60 at Page 60 of the New Milford Land Records conveyed the property with the "privileges and appurtenances thereof". [Ex. 17, Doc. # 59 at 10].

47. The Administrator's Deed from John F. Schroeder to Henry H. Schroeder (1/3), Eliza Tyler (1/3) and Cornelia E. Wright (1/3) dated May 13, 1898 and recorded June 11, 1898 in Volume 63 at Page 185 of the New Milford Land Records included any easements appurtenant to the dominant estate. [Ex. 18, Doc. # 59 at 10].

48. The Warranty Deed from Eliza Tyler (1/3) and Cornelia Wright (1/3) to Henry H. Schroeder dated March 20, 1899 and recorded March 24, 1899 in Volume 63 at Page 256 of the New Milford Land Records conveyed the property with all appurtenances thereof. [Ex. 19, Doc. # 59 at 11].

49. The Administrator's Deed from Henry H. Schroeder to Niles Lindstrom dated October 11, 1920 and recorded October 11, 1920 in Volume 76 at Page 362 of the New Milford Land Records conveyed the property with all appurtenances thereof. [Ex. 20, Doc # 59 at 11].

### Lindstrom to Hart to Galvin 1933–1981

50. The property was conveyed by Warranty Deed from Niles C.T. Lindstrom to Jona-

than T. Hart, Jr. dated September 6, 1933 and recorded September 6, 1933 in Volume 89 at Page 127 of the New Milford Land Records, with all appurtenances thereof. [Ex. 21, Doc # 59 at 11, Doc. # 62 ¶ 22].

51. In 1971, Jonathan Hart commissioned Arthur H. Howland to prepare a field survey of his property and the right of way to his property. [Doc. # 62 ¶ 25].

52. Mr. Howland prepared a map (Ex. 24) which states his opinion as to the boundaries and configuration of property that includes: a) the land that Buck reserved to himself in his 1802 deed to Luke Hallock (Ex. 2); b) the former Stone-to-Phelps parcel (Ex. 505); and c) a piece of the Ten Rod Highway that Joseph and Amos Hallock acquired from the Selectmen (Ex. 515), altogether the former Ousatonic Iron Company land (Ex. 10). [Doc. # 62 ¶ 26].

53. The Warranty Deed from Jonathan T. Hart, Jr. to James Galvin and Kathleen Galvin, dated February 3, 1981 and recorded February 26, 1981 in Volume 287 at page 936 of the New Milford Land Records, conveyed the property with all appurtenances, including the rights that seller "may have to pass in a passway as reserved in a deed from Samuel Beebe Buck to Luke Hallock dated February 15, 1802 and recorded in Volume 23, at Page 432 of the New Milford Land Records". [Ex. 22, Doc # 59 at 11–12, Doc. # 62 ¶ 28].

54. From as early as 1971, the plaintiffs' predecessor in title, Jonathan Hart, used the passway to access his property, go camping with his family and walk the property. [Doc. # 59 at 12].

55. From as early as 1971, the passway was visible, had been used for vehicular traffic and had wheel tracks. [Doc. # 59 at 12]. (Howland Map Prepared for Jonathan Hart, 1971, Ex. 24, hereinafter the "Hart Map").

56. Prior to the plaintiffs' purchase of the Hart property, there existed a "travelway" that other people had apparently been using, in part, over the "passway" parcel. [Doc. # 62 ¶ 33].

57. The "travelway" went from Indian Trail Road in a northerly direction, past the plaintiffs' two-rod strip of land. [Doc. # 62 ¶ 34].

58. Prior to 1981, the land purchased by the plaintiffs was raw, unimproved, and bare. [Doc. # 62 ¶ 35].

59. There is no evidence that defendant's "passway" parcel has ever been used to provide utilities to the "Galvin" parcel or to any other lands. [Doc. # 62 ¶ 36].

*The Galvins' Ownership of the Dominant Estate*

60. Plaintiffs purchased their property known as 178 Indian Trail Road, New Milford, Connecticut on February 3, 1981. [Ex. 22, Doc. # 59 at 12].

61. Plaintiffs would not have purchased this property if they did not have a right of access to the property. [Doc. # 59 at 12].

62. In 1981, there was physical evidence that the passway had been used for vehicular traffic and had been in existence for some time prior thereto. [Doc. # 59 at 13].

63. Commencing in 1981, the plaintiffs used the passway daily to access their property and have done so continuously to the date of this action. [Doc. # 59 at 13].

64. Plaintiffs' use of the property was open, visible and continuous. [Doc. # 59 at 13].

65. The plaintiffs' use of the passway was open and visible to the "naked eye". [Doc. # 59 at 13].

66. From 1981 to 1983, plaintiffs boxed in the passway, removed the topsoil with a backhoe, and placed gravel over the passway. The plaintiffs put a trailer on their property and began living there in 1983. [Doc. # 59 at 13, Doc. # 62 ¶ 40].

67. In 1982, the defendant visited the plaintiffs' property and objected to their use of graveled passway, challenged plaintiffs' use of the easement, and claimed ownership of their property. The police were called. [Galvin Test. 3/26/96].

68. The plaintiffs asked defendant on several occasions for an easement across the "passway" parcel for the purpose of laying utility lines to serve their property. The defendant refused to give such an easement or to allow such use of her property. [Doc. # 62 ¶ 41].

69. The plaintiffs constructed a dwelling on their property between 1982 and 1984, and moved into the dwelling in December 1994. [Doc. # 59 at 14].

70. The plaintiffs' dwelling is located entirely on the parcel conveyed by Buck to Phelps and thus is entirely located on the dominant estate. [Doc. # 59 at 14].

71. In December 1995, the defendant gave written notice to each plaintiff of her intention to dispute their claims to a right-of-way and other easements and to prevent them from acquiring any such rights in her property, including the passway parcel. This, notice was served in hand upon the plaintiffs by a Deputy Sheriff of Litchfield County. A copy of the notice was recorded on December 22, 1995 in the land records of the Town of New Milford, Connecticut. [Doc. # 62 at ¶ 42, Ex. 516A, 516B].

72. The only access to plaintiffs' property is through the passway. [Doc. # 59 at 14].

73. The actual pathway, as depicted on the Hart Map (Ex. 24), is located entirely within the passway. [Doc. # 59 at 14, Ex. 29].

74. The "dirt road" depicted on the Hart map and another prepared for Anthony Rubino (Ex. 30) is the pathway used by the plaintiffs and their predecessors, and is approximately 10 feet wide and located totally within the passway. [Doc. # 59 at 15].

75. The plaintiffs have used the passway under a claim of right pursuant to the purported right-of-way in their deed from Jonathan Hart. [Ex. 24, Doc. # 59 at 15].

76. Without the passway, the plaintiffs' property would be landlocked as it is surrounded by private landowners and the land surrounding the plaintiffs' property is inaccessible to vehicular traffic due to the topography. [Doc. # 59 at 15].

77. The plaintiffs currently have limited electric power supplied by a gasoline powered generator. The generator is old, and must be replaced. A new generator will be extremely expensive. [Doc. # 59 at 15].

78. The installation of underground utilities, including a telephone line and electrical wires, would be of a significant benefit to the Galvins' property. [Doc. # 59 at 15].

79. The installation of underground utilities would impose a minimal burden on the defendant's property, as it would simply involve digging a three foot deep trench. The defendant's property could be restored to its natural state once the utilities are installed. The defendant, a resident of New York, does not live on her property. The defendant herself did not testify and offered no evidence concerning any burden the installation of underground utilities would impose on her property. [Doc. # 59 at 15].

80. The only available route to install utilities is via the passway, as the land surrounding the plaintiffs' property is impassable. [Doc. # 59 at 16].

81. An underground telephone wire would be less burdensome and require less maintenance then the above-ground telephone wires which currently serve the plaintiffs' property. [Doc. # 59 at 16].

82. The plaintiffs are unable to obtain a certificate of occupancy from the Town of New Milford without electrical lines. [Doc. # 59 at 16].

83. The defendant's chain of title makes specific references to names of plaintiffs' predecessors in title. [Doc. # 59 at 17, Def.'s Ex. 503, Def.'s Ex. 504].

84. A "Judgment Confirming Arbitration Award," recorded in the New Milford Land Records on April 9, 1984, is in the defendant's chain of title. In the referenced action, *Estate of Anthony J. Rubino v. Elizabeth Gaffney,* the court ruled on July 11, 1982 that the "Map Prepared for Anthony J. Rubino" by Arthur Howland was accurate and depicted the proper boundary lines between the property owned by the Estate of Anthony J. Rubino and the property owned by Elizabeth Gaffney. [Ex. 23, Doc. # 59 at 17].

85. The "Map Prepared for Anthony J. Rubino," dated October 1973, is in the defendant's chain of title and was found in the New Milford Land Records by the defendant's expert witness. [Doc. # 59 at 17, Ex. 30].

86. The "Map Prepared for Anthony J. Rubino" depicts the six-rod passway located on defendant's property and depicts by parallel

dotted lines a "dirt road" or "travelway" approximately ten feet wide contained within the passway. [Doc. # 59 at 18, Ex. 30, Ex. 30A, Howland Tr. 4/9/96 at 46].

87. The defendant's title searcher did not physically inspect the defendant's property, did not search the land records prior to 1945, and did not review court records of actions affecting the defendant's property. [Doc. # 59 at 18].

88. The defendant Gaffney owns property that abuts the plaintiffs' property to the north, south and west. [Doc. # 59 at 18].

89. The Galvins' sole means of access to a public roadway is over the "dirt road" or "travelway," so-called, which lies within the passway first described (for our purposes) in the 1802 deed from Buck to Luke Hallock. [Doc. # 59 at 18].

90. Defendant denies the existence of a right to pass and repass in the passway and denies that any easement includes the right to install utilities to the Galvin house. Her refusal to allow the installation of utilities to the Galvin residence has interfered with the use and enjoyment of the dominant estate and has disturbed and obstructed plaintiffs' rights and privileges to use the easement. [Doc. # 59 at 19].

*Conclusions of Law*

This Court has previously ruled that "the easement created by the 1802 deed from Buck to Luck Hallock did not revive merely upon the severance of the former servient (Gaffney) and dominant (Galvin) estates" in 1826. [Doc. # 46 at 11]. Plaintiff urges that this Court find that an easement was newly created at the time of severance by implication and/or necessity or has been created since the severance by prescription.

*Easement by Prescription*

Connecticut General Statute § 47–37 provides:

No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years.

"[A] prescriptive easement is established by proving an open, visible, continuous and uninterrupted use for fifteen years made under a claim of right." *Gioielli v. Mallard Cove Condominium Assoc. Inc.*, 37 Conn. App. 822, 829, 658 A.2d 134 (1995) (citations omitted). Plaintiff must prove his claim by a fair preponderance of the evidence. *Id.* "[T]he character of the use, whether adverse or permissive, is to be determined as an inference from the circumstances of the parties and the nature and character of the use." *Id.* (citation omitted).

Plaintiff has failed to show that there was "open, visible, continuous and uninterrupted use for fifteen years." The Galvins purchased the dominant estate in February 1981, and began construction of the driveway and use of the passway to access their property thereafter. In December 1995, defendant served notice of her intention to dispute plaintiffs' claims to a right-of-way and other easements and to prevent the Galvins from acquiring any rights to her property, including the passway. Even assuming that this written notice constitutes the first notice by Gaffney to dispute the prescriptive use of the passway, plaintiffs still fall short of the statutory period by two months. Notwithstanding testimony regarding use of the passway in 1971 by Jonathan Hart, their predecessor in title, plaintiffs have not proven by a preponderance of the evidence that Hart's use was continuous and uninterrupted from 1971 forward for purposes of tacking. Accordingly, plaintiffs cannot prevail on their claim that a modern easement was created by prescriptive use.

*Easement by Implication*

"In this state, the law regarding easements by implication arising out of the severance of title of two adjoining or commonly owned properties is well settled." *Schultz v. Barker*, 15 Conn.App. 696, 700, 546 A.2d 324 (1988) (Internal quotation marks omitted). "There are two principal factors to be examined in determining whether an easement by implication has arisen: (1) the intention of the parties; and (2) whether the easement is reasonably necessary for the use and normal enjoyment of the dominant estate." *O'Brien*

*v. Coburn,* 39 Conn.App. 143, 148, 664 A.2d 312 (1995) (internal quotation marks omitted).

 The following elements must be satisfied to establish an easement by implication. First, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part of the estate. Second, at the time of severance, the servitude is in use. Third, the servitude is reasonably necessary for the fair enjoyment of the estate. Further, "[i]n so far as necessity is significant it is sufficient if the easement is highly convenient and beneficial for the enjoyment of the dominant estate." *Schultz,* 15 Conn.App. at 701, 546 A.2d 324; *Rischall v. Bauchmann,* 132 Conn. 637, 643, 46 A.2d 898 (1946) (The necessity required is not an "absolute" necessity; rather, all that is required is that the "easement is highly convenient and beneficial for the enjoyment of the portion granted.").

The principle underlying the creation of an easement by implication is that it is so evidently necessary to the reasonable enjoyment of the granted premises, so continuous in its nature, so plain, visible and open, so manifest from the situation and relation of the two tracts that the law will give effect to the grant according to the presumed intent of the parties.

*Rischall,* 132 Conn. at 645, 46 A.2d 898 (*quoting Robinson v. Clapp,* 65 Conn. 365, 384–85, 32 A. 939 (1895)). The basis of an easement by implication "is the presumption of a grant arising from the circumstances of the case." *Marshall v. Martin,* 107 Conn. 32, 36, 139 A. 348 (1927). "The presumption, however, is one of fact and whether or not the grant is to be implied in a given case depends upon the terms of the deed and the facts in that case." *Rischall,* 132 Conn. at 644, 46 A.2d 898 (*quoting Doten v. Bartlett,* 107 Me. 351, 354, 78 A. 456 (1910)).

 The record establishes that there was an easement over the passway appurtenant to the Galvin estate beginning in 1802. The 1810 conveyance created a unity of ownership that extinguished the easement.[4]

During this unity of title, there was an apparent and obvious servitude which existed at the time of the severance. The 1824 Joseph D. and Amos Hallock conveyance to Jesse Hallock of the "Buck Swamp Parcel" with the "privilege of passing and repassing" over the 1802 Bucks to Phelps passway establishes that this passway existed and was in use in 1824, providing access to Jesse's property as well as the dominant estate. The Court affirms its earlier finding that "[t]he easement over the passway to Jessie Hallock for the Buck Swamp Parcel was only necessary if that parcel was treated as a separate parcel and thus landlocked, or if Jesse's other land was physically inaccessible." [Doc. # 46 ¶ 23]. Moreover, upon the severance in 1826, "the only access for Amos Hallock to the jointly held property (dominant estate) was over the passway." *Id.* ¶ 27. Indeed, "[t]he conveyance from Amos Hallock to Joseph Hallock was made with reservation of all appurtenances thereto," *id.* ¶ 26, with reference back to the Buck to Luke Hallock deed wherein the right to pass was created. Ex. 7, Howland Tr. 3/29/1996 at 132–34. The inference of a grant by implication is further supported in the plaintiff's chain of title, which reflects that all the deeds conveying the dominant estate from 1826 through 1981 include "all" or "any" easements appurtenant to the property. Thus, the first and second *Rischall* criteria are established by the documentary evidence.

The Court also finds that the servitude is reasonably necessary for the fair enjoyment of the estate. The Galvin estate is landlocked. There is no evidence in the record to support a finding that the Ten Rod Highway is, or ever was, historically or practically an alternate access route to the dominant estate. Rather, the documentary evidence and testi-

4. In 1802 Samuel Buck deeded to Luke Hallock the property now owned by the defendant Gaffney. Upon this conveyance to Hallock, Buck's parcel became landlocked, entirely surrounded by the land of other private landowners. In the 1802 deed, Buck reserved an easement appurtenant to his land to pass and repass along the six rod passway. In 1810, Phelps' conveyance to Joseph D. and Amos Hallock merged the Galvin and Gaffney estates creating a unity of ownership that extinguished the appurtenant easement created by the 1802 Buck deed to Luke Hallock. *See* Doc. # 46 at 6–9.

mony demonstrates that the passway has provided the only reasonable access to the dominant estate and is reasonably necessary for the fair enjoyment of that estate.

Lastly, the Court finds that in 1826, when Amos Hallock quit-claimed his interest in the now-Gaffney estate to Joseph D. Hallock, he did not intend to leave the Galvin estate without reasonable access and, therefore, intended to create anew an easement over the passway in favor of the Galvin estate. "The law will not presume, that it was the intention of the parties, that ... [the grantor] should so convey a portion as to deprive himself of the enjoyment of the remainder." *Hollywyle Assn. Inc. v. Hollister*, 164 Conn. 389, 398, 324 A.2d 247 (1973) (quoting *Collins v. Prentice*, 15 Conn. 39, 44 (1842)).

Based on the full record, the Court finds sufficient evidence to establish an easement by implication over the defendant's property in favor of plaintiffs' property.

*Easement By Necessity*

■ The Court similarly finds the existence of an easement by necessity over the passway in favor of plaintiffs' property.

An easement by necessity will be imposed where a conveyance by the grantor leaves the grantee with a parcel inaccessible save over the lands of the grantor, or where the grantor retains an adjoining parcel which he can reach only through the lands conveyed to the grantee ... [T]o fulfill the element of necessity, the law may be satisfied with less than the absolute need of the party claiming the right of way. The necessity need only be a reasonable one ... The element of necessity is dependent on the nature of the property, the situation of the parties, and other surrounding circumstances and arises as a result of objective necessity rather than as a result of the deeds ... Thus, the terms 'necessary' and 'reasonable enjoyment' can have no fixed meaning.

*First Congress Avenue Corp. v. 495 Congress Avenue Assoc. Limited*, No. 9503882797S, 1996 WL 362094, *2 (Conn.Super.Ct. May. 28, 1996) (citations omitted). "The requirement of unity of ownership is a strict one; but to fulfill the element of necessity, the law

may be satisfied with less than the absolute need of the party claiming the right of way." *Hollywyle*, 164 Conn. at 399, 324 A.2d 247 (1973).

■ Analyzing the same facts, the Court finds that an easement was created in 1826 by necessity, if it were not created by implication. This right arises as a result of objective necessity. There was common ownership. Upon severance of the property in 1826, the dominant estate became landlocked, after which the dominant estate's only access to a public highway was by the passway located on the servient estate. An easement by necessity does not rest on the implied intent of the parties because intent in that situation is recognized to be a fiction of the law, and "merely disguises the public policy that no land should be left inaccessible or incapable of being put to profitable use." *Abington Ltd. Partnership v. Talcott Mountain Science Center for Student Involvement, Inc.*, No. CV920513349S, 1996 WL 715413, *6 (Conn.Super.Ct. Dec. 3, 1996) (internal citations and quotation marks omitted).

■ "Although called a way of necessity ... [s]uch a way is... not created by mere necessity; it always originates in some grant or change in ownership to which it is attached by construction as a necessary incident, presumed to have been intended by the parties." *Larson v. Hammonasset Fishing Ass'n., Inc.*, No. CV 930068175S, 1996 WL 156014, *1 (Conn.Super.Ct. March 15, 1996).

All of the evidence in this case establishes that it was intended upon severance of the property that the Galvin parcel be accessed through the passway since that was the only access available.

*Scope of the Easement*

■ The use of the passway to provide utility services would be "highly convenient and beneficial" for the enjoyment of the dominant estate. *D'Amato v. Weiss*, 141 Conn. 713, 717, 109 A.2d 586 (1954); Restatement (Third) of Property § 2.15 cmt. d. (1989) (recognizing servitudes by necessity for electricity and telephone service by overland cables.); *see id.* cmnt. d, illus. 12 (recognizing servitude by necessity for surface travel and

for utility service to landlocked property in a rural residential area).

A broad reading of the easement is supported by court decisions both in Connecticut and other jurisdictions. *Miskin v. Wroblewski*, No. CV 960561277S, 1997 WL 614514, *1 (Conn.Super.Ct. Sept.26, 1997) (finding that the installation of utility lines under the right-of-way is a permissible use of the easement); *Foster Development Associates v. Talar*, No. CV 890512401S, 1996 WL 367773, *2 (Conn.Super.Ct. June 10, 1996) (finding easement included right to install a "roadway, drainage facilities, electric and telephone lines and underground service lines such as water, sewer and gas."); *Stott v. Dvorak*, No. CV 92–0101097S, 1994 WL 131131 (Conn.Super.Ct. Apr. 5, 1994) (access for both travel and utilities is necessary, convenient and beneficial for the fair enjoyment of the estate); *but see, Kuras v. Kope*, 205 Conn. 332, 533 A.2d 1202 (1987) [5] (finding prescriptive easement did not include underground utility lines); *Cushing v. Stanish*, No. CV 93–0348642, 1995 WL 41350 (Conn.Super.Ct. Jan.24, 1995), *aff'd without opinion*, 41 Conn. App. 902, 673 A.2d 1181 (1996).

Courts in other jurisdictions have also interpreted easements broadly so as to permit the provision of utility services to dominant estates. *See Atkinson v. Mentzel*, 211 Wis.2d 628, 566 N.W.2d 158, *163 (Wis.App. 1997) ("Although at the time of the conveyance creating the easement the property was not served by utilities, the reasonable use of the property in current times requires utility services."); *Cline v. Richardson*, 526 N.W.2d 166 (Iowa App.1994)(easement included right to install utilities); *Morrell v. Rice*, 622 A.2d 1156, *1160 (Me.1993) ("the right to install such utilities was included in the easement.");

*Ware v. Public Ser. Co. of New Hampshire*, 412 A.2d 84, 86 (Me.1980) (right to use road includes right to erect poles for electricity); *Kelly v. Schmelz*, 439 S.W.2d 211, 213 (Mo. Ct.App.1969) (same); *Fleming v. Napili Kai, Limited*, 50 Haw. 66, 430 P.2d 316, 319 (Haw.) ("It is the usual and common practice in this State to use roadway easements as rights of way for electricity, telephone, water and drainage facilities …"), *reh'g denied*, 50 Haw. 83, 431 P.2d 299 (Haw.1967); *Dowgiel v. Reid*, 359 Pa. 448, 59 A.2d 115, 118 (Pa. 1948) (easement includes right to erect poles for electricity); *New York Cent. R. Co. v. Yarian*, 219 Ind. 477, 39 N.E.2d 604, 607 (Ind.1942) (same); *Diller v. St. Louis S. & P.R.R.*, 304 Ill. 373, 136 N.E. 703, 704–05 (Ill.1922) (easement allows installation of underground conduit); *Davis v. Jefferson County Telephone Co.*, 82 W.Va. 357, 95 S.E. 1042, 1044 (W.Va.1918) (same regarding telephone lines).

Defendant provided no evidence regarding any burden to the servient estate if the Court were to recognize that the easement includes the right to install underground utilities. The Galvins could continue the "constant stream of deliveries of generator fuel and heating oil, along with whatever other supplies are required to make up for the missing utilities. A power line buried underneath the dirt surface of … [the road] presents less of a burden on the right of way and inconvenience to other property owners than the alternative." *Stott v. Dvorak*, No. CV92–0101097S, 1994 WL 131131, *10, (Conn.Super.Ct. Apr.5, 1994); *Dowgiel v. Reid*, 359 Pa. 448, 59 A.2d 115, 121 (1948) (poles for transmission of electricity is "a reasonable and natural use of the private road for the

---

5. The Court has reviewed the Connecticut Supreme Court's decision in *Kuras v. Kope*, 205 Conn. 332, 533 A.2d 1202 (1987) and finds the case distinguishable on its facts and the law. In *Kuras*, the Court found there was insufficient evidence to prove that "utilities" served the dominant estate during the prescriptive period or that the adverse use, namely underground electric or telephone lines, was ever reasonably foreseen by the servient tenement during the prescriptive period. *Id.* 205 Conn. at 351, 533 A.2d 1202. "The extent of an easement created by prescription is fixed by the use through which it was created." *Id.* Thus, the Court confined its analy-

sis to the adverse use during the prescriptive period in determining whether the dominant estate could install underground utilities. The Court added, "[w]e point out that our opinion on the underground utilities issue is in no sense a determination that a similar request under circumstances different from this case will necessarily yield the same result." *Id.*

Similarly, the Court declines to follow *Cushing v. Stanish*, No. CV 93–0348642, 1995 WL 41350 (Conn.Super.Jan.24, 1995), *aff'd without opinion*, 41 Conn.App. 902, 673 A.2d 1181 (1996) after careful examination of the facts and law set forth in the opinion.

purpose for which it was created, to wit, to enable the owners and occupants of the premises to which the road is appurtenant to obtain something which is essential to the livableness of the home, to wit, electricity...."). "The reasonable uses of the dominant tenement in connection with which the passway may be used are not limited to those to which the land was being put when the way was granted." *Birdsey v. Kosienski,* 140 Conn. 403, 413, 101 A.2d 274 (1953); *Dowgiel,* 59 A.2d at 118 (Grantee is entitled to avail himself of "modern inventions" if necessary to its reasonable enjoyment).

Here, the town will not grant plaintiffs a certificate of occupancy until utilities are installed. The installation of underground utilities in the passway is "highly convenient and beneficial" to the use and enjoyment of the dominant estate and the Court finds on the present record that it will not overburden the servient estate. In fact, it appears from the evidence presented to date that underground utilities will decrease the burden on the servient estate.

*The Marketability of Title Act*

█ Finally, defendant argues that the Marketability of Title Act, Connecticut General Statutes § 47–33b *et seq.,* precludes plaintiffs' claimed easement because the easement is rooted in a conveyance that occurred more than 150 ago.

█ The purpose of the Act is to limit title searches to some reasonable period, in Connecticut forty years, "and thus avoid the necessity of examining records back into distant time for each new transaction." *Simonds v. Shaw,* 44 Conn.App. 683, 689–90, 691 A.2d 1102 (1997) (citing *Mizla v. Depalo,* 183 Conn. 59, 64, 438 A.2d 820 (1981)).

Here the record demonstrates that the dominant estate was rendered landlocked upon its severance from the servient estate in 1826. The conveyance deeds from that time up to the Galvins' purchase all refer to appurtenances in the chain of title for the

dominant estate. Moreover, the passway was observable to the eye and has provided the only means of access to the dominant estate since at least 1802. This Court has found that the "Ten Rod Highway" was only a "paper highway" and never existed or provided access to the Galvin property.

Conn. Gen.Stat. § 47–33h [6] "expressly exempts easements from being extinguished by the Marketability of Title Act where the easement is evidenced by a road or other structure. A party cannot extinguish such easement if the interest is evidenced by the location of said easement on the land." *Simonds,* 44 Conn.App. at 690, 691 A.2d 1102.

Because the passway was observable on the land, the Marketability of Title Act does not defeat or extinguish plaintiffs' easement.

*CONCLUSION*

For the reasons stated, the Court finds that an easement by implication and, alternatively, by necessity was created upon the severance of the dominant and servient estates in 1826. This easement gives plaintiffs the right to pass and repass along the passway, and includes the right to install underground utility lines.

Because plaintiffs may cause no damage to the surroundings except what is reasonably necessary, and must restore the land to its original appearance as soon as, and to the extent that is, reasonably possible, the parties shall contact the Court to schedule further proceedings consistent with this Ruling.

In accordance with the agreement of the parties, this Ruling and the Court's prior Ruling constitute recommended rulings pursuant to 28 U.S.C. § 636(b), and the parties reserved their right to object until the conclusion of the bifurcated proceedings.

Any objections must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil

---

**6.** Section 47–33h provides, in relevant part, "Section 47–33b to 47–33l, inclusive, shall not be applied to ... bar or extinguish any easement or interest in the nature of an easement ... if the existence of such easement or interest is evidenced by the location beneath, upon or above any part of the land described in such instrument of any pipe, valve, road, wire, cable, conduit, duct, sewer, track, hole or other physical facility...."

Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995).