No. 100,733

ED STRODA, as Trustee for the EDMOND STRODA REVOCABLE
TRUST, *Appellee,* v. JOICE HOLDINGS, LLC, A Kansas Limited
Liability Company, *Appellant.*

(207 P.3d 223)

Opinion filed May 15, 2009.

*Bradley R. Finkeldei,* of Stevens & Brand, LLP, of Lawrence, argued the cause and was on the briefs for the appellant.

*Vernon L. Jarboe,* of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, LLC, of Topeka, argued the cause, and *Martha A. Peterson,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

NUSS, J.: This case requires us to determine the extent of an easement that the parties agree had been created by implication. The trial court held that the easement could be used for access across the servient tenement to a future residence on the dominant tenement and for utilities to that residence. The owner of the servient tenement appeals both rulings. We affirm.

## FACTS

In 1952, Lawrence and Etta Stroda, grandparents of Ed Stroda, purchased Douglas County farmground containing an occupied

residence: the Northwest Quarter (NW ¼). They were allowed an easement across neighboring farmground, the Southwest Quarter (SW ¼), to gain access to their land. In 1957, Lawrence and Etta in turn bought the SW ¼. This purchase joined both tracts under single ownership, and by the doctrine of merger, extinguished the easement.

Upon Etta's death in 1985, the property ownership unity was severed, with ownership of the SW ¼ passing to her daughter, Marie Jarboe, and the NW ¼ to her son, Edmond Stroda, Sr. The severance allowed an easement across Marie's SW ¼ to again be created through implication, allowing Edmond access to his NW ¼. From 1985 onward, both tracts were farmed by the same agricultural tenant.

In 2001, ownership of the NW ¼ passed from Edmond to his trust, the appellee, with his son, Ed Stroda, serving as a trustee (Stroda). In 2003, ownership of the SW ¼ passed from Marie to Charles Joice and then to the appellant, Joice Holdings, LLC (Joice).

In October 2006, Stroda sought to sell the NW ¼ for use as a single residence, claiming that the easement across the SW ¼ could support both residential access and utility use. As owner of the SW ¼, Joice admitted the existence of an implied easement but contended that its use was limited to strictly agricultural purposes. The residence on the NW ¼ had ceased to be occupied in 1957, and no one had lived on the tract since that time. However, during the time that Etta had owned both tracts, *i.e.*, before 1985, she and her son Edmond had discussed building a new house on the NW ¼. At that time he had looked into the requirements to obtain a building permit and the costs to put in electricity and water. These plans were never fully executed.

After Joice's objection, Stroda filed an action requesting a judicial declaration that an easement existed allowing access across Joice's tract for residential and agricultural purposes. Joice then filed a motion for summary judgment, which was partially granted in holding that the earlier easement was extinguished by the doctrine of merger. The motion was also partially denied, with the trial

court citing the Restatement (Third) of Property to hold that future use of the easement for residential purposes was also appropriate.

The trial court was unable to rule on the related utility easement issue because of the lack of evidence on the type of utilities to be placed and the damage, if any, they would cause Joice's tract. After a bench trial later that month to determine the extent of the utilities' impact, the court then determined that utility use was reasonable and therefore appropriate. Per the journal entry, the court made an express finding that "Plaintiff [Stroda] further has the right to install such utilities as Plaintiff may desire, as long as it is underground and within the confines of the area currently used for the access easement."

Joice appealed, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

Other facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court correctly held that the implied easement allowed for residential access.*

The material facts are undisputed. Both parties agree that an implied easement exists over the SW ¼ (the servient tenement) for the benefit of the NW ¼ (the dominant tenement). Accordingly, the issue is the appropriate scope of that easement Under these circumstances, this court's review is unlimited. *Botkin v. Security State Bank*, 281 Kan. 243, 130 P.3d 92 (2006) (When facts are undisputed, appellate review of the district court's grant of summary judgment is de novo.).

In arguing that the easement is limited to agricultural purposes, Joice first cites to decisions of this court involving express easements. See, *e.g., City of Arkansas City v. Bruton*, 284 Kan. 815, 166 P.3d 992 (2007). Joice acknowledges *Bruton* involved an express easement but argues it should apply to implied easements: "[A]n easement should not be expanded beyond the purpose for which it was created and the use made of the dominant tenement at the time of the grant." Joice argues that the purpose and use of the easement at the time of creation was solely for agricultural purposes; accordingly, it should not be expanded to include resi-

dential use. In support of this same proposition, Joice also cites to decisions of other jurisdictions involving easements by prescription. See, *e.g.*, *Crane v. Hayes*, 187 W. Va. 198, 417 S.E.2d 117 (1992); *Burns v. Goff*, 164 W. Va. 301, 262 S.E.2d 772 (1980).

On these facts, we disagree with Joice's reliance upon these cases. Express easements and prescriptive easements contain fundamental differences from those that are implied. The scope of an express easement is much more ascertainable; one essentially looks at the language employed by the parties. Parties to an instrument know that document is to be the final expression of their intentions, and there is little, if any, need to give much weight to circumstantial evidence of their intent. By contrast, an implied easement obviously has no express language and external evidence of intent becomes much more important. While we acknowledge that a prescriptive easement is similar to an implied easement in that neither has express language to interpret for determining the intent of the parties, prescriptive easements are interpreted narrowly because they are created by the adverse use of the property, with the use during the prescriptive period defining the scope of the easement. See *Dotson v. Railway Co.*, 81 Kan. 816, 106 P. 1045 (1910).

Wisely, Joice relies primarily upon an implied easement case in Kansas: *Van Sandt v. Royster*, 148 Kan. 495, 83 P.2d 698 (1938). There, Van Sandt sued his neighbor because their common underground sewer line kept spilling onto Van Sandt's property. Van Sandt claimed there was no implied easement allowing the line to cross his property. This court easily rejected his argument. Among other things, it held that Van Sandt should have known there was such a sewer line when he purchased the property because he himself had indoor plumbing.

Joice relies upon *Van Sandt* to argue that circumstances (uses) at the time of the easement's creation exclusively determine the parties' intent, and further, that even those circumstances (uses) can be additionally limited if they are no longer reasonably necessary:

"*Van Sandt* sets forth a two part test: first, what uses were in place at the time of the conveyance (*i.e.*, continuance of uses) and, second, are those continued uses reasonably necessary so as to be allowed to continue. Therefore, *Van Sandt* makes

it clear that not even all of the uses that existed before the division of the property that created the implied easement are necessarily allowed to continue, only those that are reasonably necessary. Given this well established test, it is clear that *Van Sandt* does not allow for an expansion of previous uses by implied easement[;] rather it limits the previous uses to only those reasonably necessary."

Joice's cited language from *Van Sandt* in support of this argument comes from comment j, § 28, of the Restatement (First) of Property (Tentative Draft No. 8, 1937):

" 'Parties to a conveyance may, therefore, be assumed to intend the continuance of uses known to them which are in a considerable degree necessary to the continued usefulness of the land. Also they will be assumed to know and to contemplate the continuance of reasonably necessary uses which have so altered the premises as to make them apparent upon reasonably prudent investigation.' " *Van Sandt*, 148 Kan. at 501.

As Stroda points out, however, Joice is only quoting a portion of the entire proposed comment from the Restatement's tentative draft. The comment actually begins:

" 'The effect of the prior use as a circumstance in implying, upon a severance of possession by conveyance, an easement or a profit results from an inference as to the intention of the parties. *To draw such an inference, the prior use must have been known to the parties at the time of conveyance, or, at least, have been within the possibility of their knowledge at the time. Each party to a conveyance is bound not merely to what he intended, but also to what he might reasonably have foreseen the other party to the conveyance expected.' "* (Emphasis added.) *Van Sandt*, 148 Kan. at 501.

After the portion quoted by Joice, the full tentative draft concludes with:

" 'The degree of necessity required to imply an easement in favor of the conveyor is greater than that required in the case of the conveyee . . . . Yet, even in the case of the conveyor, the implication from necessity *will be aided by a previous use made apparent by the physical adaptation of the premises to it.' "* (Emphasis added.) *Van Sandt*, 148 Kan. at 501.

Taken in its entirety, the tentative draft of the comment does not support Joice's limiting argument. Instead it supports the idea that prior use, as a factor in determining the intent of the parties, includes not only uses that were known at the time of the conveyance, but also those that had a possibility of being known at that time and those that a party "might reasonably have foreseen the

other party . . . expected." See also *Smith v. Harris*, 181 Kan. 237, 249, 311 P.2d 325 (1957) ("The implied easement arising from an 'implied reservation or grant' is founded upon the intention of the parties as well as what might reasonably have been foreseen the other party to the conveyance expected.").

In the instant case, Joice admits the implied easement was created in 1985 when the property was divided and the tenant who farmed the SW ¼ was also allowed to cross it to farm the NW ¼. Residential use was known, and certainly had a possibility of being known, to the parties. A look at the NW ¼ in 1985 would have revealed the existence of a residence, albeit unoccupied, on the tract. The trial court expressly found that the residence's remains were evident from photographs taken 20 years later. Consequently, that prior use can be used in determining the intent of the parties.

Moreover, evidence shows that before the implied easement was created, the owner of the NW ¼, Etta, had discussions with her son and eventual owner of that tract, Edmond, about building a house there. He in turn looked into obtaining a building permit and the cost of supplying the house with electricity and water. As owner of both tracts, Etta therefore might reasonably have foreseen that Edmond expected to use the NW ¼, and the related easement, for residential purposes.

It is also valuable to consider other language that became part of the permanent Restatement on Property when adopted in 1944, 6 years after *Van Sandt*. That language is best examined in the context of case law cited by Stroda that is directly on point.

In *Fristoe v. Drapeau*, 35 Cal. 2d 5, 215 P.2d 729 (1950), grantor Whittier built a permanent gravel roadway through its tract. Whittier then planted lemon and avocado groves and subdivided. Before any parcels were sold Whittier used the road for ingress and egress from all parcels for tree pruning, fertilization, and other work incidental to growing lemons and avocados. Plaintiff Fristoe and defendant Drapeau bought tracts adjoining the roadway, with Drapeau objecting when Fristoe wanted to use the road to access a residence she intended to build on her parcel.

As in the instant case, defendant acknowledged an implied easement, but argued that it was restricted to use being made at time

of severance of plaintiff's parcel—agricultural purposes, *e.g.*, servicing the groves—and that using the road for access to a residence would increase the burden of the easement. The trial court rejected this restricting argument. The California Supreme Court affirmed, first observing that

"[T]he purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances. Although the prior use made of the property is one of the circumstances to be considered, easements of access have been implied in this state in situations in which there was *no* prior use." (Emphasis added.) 35 Cal. 2d at 8-9.

Important to the instant case, the court also cited Restatement (First) of Property § 484, especially comment b, which had not been cited by the *Van Sandt* court—perhaps because the restatement was still in preliminary draft form when *Van Sandt* was decided.

"The extent of an easement created by implication is to be inferred from the circumstances which exist at the time of the conveyance and give rise to the implication. Among these circumstances is the use which is being made of the dominant tenement at that time. *Yet it does not follow that the use authorized is to be limited to such use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement.* It is not to be assumed, however, that they anticipated an abnormal development. Hence, the scope of an easement created by implication does not extend to uses required by such [abnormal] development." (Emphasis added.) Restatement (First) of Property, § 484, comment b (1944).

As a result, the *Fristoe* court stated that "[c]onsideration must be given not only to the actual uses being made at the time of the severance [creation], but also to such uses as the facts and circumstances show were in the reasonable contemplation of the parties at the time of the conveyance." 35 Cal. 2d at 10. It then concluded that under all of the circumstances existing at the time of severance, "we cannot say as a matter of law that the use of the road for purposes connected with a private residence was not within the contemplation of the parties or that the trial court erred in failing

to limit plaintiff's rights in the roadway to use thereof for agricultural purposes." 35 Cal. 2d at 10.

We independently observe that as in *Fristoe* and the instant case, the court in *Adams v. Crook,* 43 Or. App. 427, 602 P.2d 1143 (1979), also dealt with a future residence on agricultural property. Like the instant case, the property had also formerly included a residence. Like *Fristoe,* the Oregon Court of Appeals looked to the Restatement (First) of Property § 484, comment b for determining the scope of the implied easement. Section 484 provided:

"In ascertaining, in the case of an easement appurtenant created by conveyance, whether additional or different uses of the servient tenement required by changes in the character of the use of the dominant tenement are permitted, *the interpreter is warranted in assuming that the parties to the conveyance contemplated a normal development of the use of the dominant tenement.*" (Emphasis added.)

Based upon facts similar to the instant case, the *Adams* court ruled that access to the proposed single residence was covered by the implied easement:

"[T]*estimony at the trial showed that the roadway was originally used to gain access to a house now no longer standing.* Since about 1930 the roadway has been used for various agricultural purposes, chiefly for the hauling of feed and livestock [to the dominant estate's pastureland] . . . . We find when the easement was created in 1946, it was foreseeable that the land, which had apparently remained unimproved since the old home had fallen into disrepair, would be used for various agricultural purposes. We further find that it was unlikely that the parties at that time would foresee a subdivision. We, therefore, affirm the trial court's limitation on the use of the easement which we interpret as authorizing a single residence." (Emphasis added.) *Adams,* 43 Or. App. at 433-34.

Of more recent vintage than *Fristoe* and *Adams* is *Tungsten Holdings, Inc., v. Kimberlin,* 298 Mont. 176, 994 P.2d 1114 (2000). There, the Montana Supreme Court repeatedly relied upon the Restatement (First) of Property § 484, comment b—not only to define the physical scope of an uncontroverted implied easement but also to deny Kimberlin's request that Tungsten Holdings' use of the road be limited to agricultural and recreational uses.

Similar to the instant case, the southern parcel owned by Kimberlin fronted a county road. The northern parcel owned by Tungsten Holdings was apparently landlocked, with the exception of

Road 399. When Kimberlin, as the owner of the southern parcel, apparently considered restricting the access to its property by Tungsten Holdings, its neighbor sued.

Kimberlin complained that the trial court had expanded the implied easement to two lanes and argued that it should be limited to the historical "narrow road." Citing comment b and *Fristoe*, the Montana Supreme Court disagreed, ultimately holding that the earlier parties "would reasonably have contemplated that they would meet on the same road." 298 Mont. at 184. Also citing comment b, it stated that "the extent of an easement created by implication 'is to be measured by . . . such uses as the parties might reasonably have expected from future uses of the dominant tenement.' " 298 Mont. at 183.

As for limiting the road use to agricultural and recreational purposes, the *Tungsten* court also rejected Kimberlin's position:

"As previously noted, the use of the easement at the time of the severance does not provide absolute limits to the use of the easement. We assume rather that the parties 'anticipated such uses as might reasonably be required by a normal development of the dominant tenement.' Restatement of Property § 484 cmt. b (1944). The Kimberlins have not pointed to anything concerning 'the circumstances existing at the time of the conveyance' *that would suggest that the parties intended that the use of the road be limited to agricultural and recreational purposes.* Restatement of Property § 484 cmt. b (1944). *Nor have the Kimberlins shown that a normal development of the northen parcel would be limited to agricultural and recreational purposes.* We hold that the District Court did not err in failing to limit the use of the easement to agricultural and recreational uses. We note, however, that whether any use of the road by Tungsten is an 'abnormal development' is not before the Court. Restatement of Property § 484 cmt. b (1944)." (Emphasis added.) 298 Mont. at 184.

For all of the above reasons, we agree with the trial court. Accessing a single residence is within the scope of the implied easement.

Issue 2: *The trial court correctly held that the implied easement allowed for utility access.*

Joice next appears to argue that even if the implied easement included residential access, it cannot include utilities for the residence. After the bench trial on the impact of the utilities on Joice's

tract, the court found "Plaintiff [Stroda] further has the right to install such utilities as Plaintiff may desire, so long as it is underground and within the confines of the area currently used for the access easement." Accordingly, our standard of review on the utilities issue could be mixed. See, *e.g.*, *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003) (When a district court has made findings of fact as a basis for its legal conclusions, our function merely is to determine whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support the conclusions of law.).

Joice does not appear, however, to take exception to the findings of the trial court regarding utility impact. Instead, according to both its original and reply briefs, it seems to only take exception to the threshold legal question of whether utilities (without regard to degree of impact) could even be considered because they would constitute an improper expansion of the original easement. It argues: "Plaintiff has asked [for], and has been granted as a matter of law, the right to expand an implied agricultural easement to allow for residential *and utility use*." (Emphasis added.) Because the trial court ruled as a matter of law that the easement included residential purposes, apparently the court also essentially ruled as a matter of law that the easement included utility purposes. Consequently, like both of the parties argue, we will consider our review of this question de novo.

The case of *Van Sandt v. Royster* is also informative of Kansas law on the issue of utility access to the NW ¼. That court held that "[I]f land may be used without an easement, but cannot be used without disproportionate effort and expense, an easement may still be implied . . . on the basis of necessity alone." *Van Sandt*, 148 Kan. at 502. As explained above, the NW ¼ can be used for residential purposes; as explained below, use of that residence would involve disproportionate effort and expense without the grant of an easement for utility purposes across the Joice tract.

A way of necessity " 'is not limited to those purposes connected with the use of a dominant tenement existing at the time the easement was created, but is available for any and all purposes for which

the dominant tenement may be adapted. . . . In other words, a way of necessity is held to be coextensive with the reasonable needs, present and future, of the dominant estate.' " *Morrell v. Rice*, 622 A.2d 1156, 1160 (Maine 1993). One legal justification for the granting of easements by necessity is that there is a use "so evidently necessary to the reasonable enjoyment" of the premises, that the law will assume it was intended by the parties. *Galvin v. Gaffney*, 24 F. Supp. 2d 223, 232 (D. Conn. 1998). Several courts have addressed whether "reasonable" use of an easement includes utility use. "In current times, the reasonable use and enjoyment of property, at a minimum, requires utilities. . . as long as it does not overburden the servient estate." *Richards v. Land Star Group, Inc.*, 224 Wis. 2d 829, 842, 593 N.W.2d 103 (1999). Likewise, utilities are "essential for most uses which property can reasonably be put in these times." *Morrell*, 622 A.2d at 1160. Even when the use of the easement at the time of creation has not included utility support, courts have found that "the reasonable use of the property in current times requires utility services." *Atkinson v. Mentzel*, 211 Wis. 2d 628, 566 N.W.2d 158 (Wis. App. 1997).

We observe that even when the use is reasonable, it must be necessary; the level of necessity required has been found to be less than strict necessity, but more than inconvenience. See *Schwob v. Green*, 215 N.W.2d, 244 (Iowa 1974) ("While . . . strict necessity need not be proven, we have also consistently said mere inconvenience is not enough."), and *Jowers v. Hornsby*, 292 S.C. 549, 550, 357 S.E.2d 710 (1987) ("The necessity must be actual, real and reasonable as distinguished from convenient, but need not be absolute and irresistible."). In our view, a lack of utilities to a new house in Kansas goes beyond mere inconvenience and begins to approach the unlivable. A house generally is not considered to be a residence without water, electricity, and similar utilities, *e.g.*, the ability to be heated and cooled, lit in the dark, and equipped for communication with the outside world.

Accordingly, in this case, allowing an implied easement for residential purposes without also allowing utility access to the NW ¼ would practically be denying residential use of the property. At the bench trial, the trial court found that it would be reasonable to

grant utility access after residential use was found to be appropriate. The Strodas testified that all of the utilities required could be placed underground in a 30-foot-wide strip, which is the width of the current implied easement. Based upon this record, we conclude as a matter of law that placement of utilities underground is necessary, and reasonable, and would not overburden the servient tenement, as they would be contained entirely within the boundaries of the already existing easement.

We have concluded that the trial court did not err in its holdings. We find nothing in the current incarnation of the Restatement of Property that changes our analysis of these two issues. See Restatement (Third) of Property: Servitudes, § 4.1 (2000) ("A servitude should be interpreted to give effect to the intention of the parties ascertained from . . . the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created."); § 4.10 ("Except as limited by the terms of the servitude determined under § 4.1, the holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude."). Indeed, the present Restatement appears to reject narrow interpretations of easements. See § 4.1, comment a (Servitudes should be interpreted to carry out the intent of the parties and the purpose of the intended servitude rather than narrowly construed to favor the free use of land. This rule is "based in the recognition that servitudes are widely used in modern land development and ordinarily play a valuable role in utilization of land resources. The rule is supported by modern case law.").

Finally, Joice suggested in its reply brief that this matter should still be remanded so that an evidentiary hearing could also be held to determine the burden of the Stroda residence on Joice's tract. Its argument was admittedly only addressing the possibility of this court expressly applying a "reasonable burden" test—purportedly urged by Stroda—to the residential easement question. Because we did not apply this test, we need not address Joice's suggestion.

Affirmed.

DANIEL L. LOVE, District Judge, assigned.