No. 94,893

CITY OF ARKANSAS CITY, KANSAS, a municipal corporation, *Appellee*, v. RONALD D. BRUTON and REBECCA A. BRUTON, husband and wife, *Appellants*.

(166 P.3d 992)

Opinion filed September 7, 2007.

*Robert D. Wilson*, of Law Offices of Wilson & Brewer, of Arkansas City, argued the cause and was on the brief for appellants.

*Alvin D. Herrington*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Otis W. Morrow*, of Arkansas City, was with him on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: Ronald and Rebecca Bruton (the Brutons) own and reside upon a 5.4-acre plot of land that is located within the City of Arkansas City. Their property borders the Arkansas River and is subject to a 1935 easement granted to the City for flood protection. The City completed improvements to the existing dike on the Brutons' property. This appeal on our grant of the City's petition for review concerns the Brutons' counterclaims for (1) a declaration of the rights under the 1935 easement and (2) inverse condemnation against the City from the construction of improvements to the dike. The Court of Appeals reversed the district court's grant of summary judgment in favor of the City. *City of Arkansas City v. Bruton*, 36 Kan. App. 2d 42, 47-48, 54-55, 137 P.3d 508 (2006). We reverse the Court of Appeals and affirm the district court's grant of summary judgment.

Throughout this opinion, technical terms relating to the construction and maintenance of a dike, which we also refer to here as a levee, are addressed. We have included definitions of terms where needed.

## FACTS

The Brutons are the record owners of a tract of land in Arkansas City, Kansas. The Brutons use the land for both residential and

commercial purposes, maintaining a home there and also using the property for their automobile salvage yard business.

In December 1935, the City entered into an agreement with the Brutons' predecessors in title, granting the City a right of way and easement to construct and maintain a dike along the Arkansas River to protect the City and its inhabitants from flooding. The easement provides in relevant part:

"That . . . first parties [the property owners] hereby grant, sell, warrant and convey to second party [the City], its successors and assigns forever, a right of way and easement with the right, privilege and authority to said party of the second part, its successors and assigns to construct and maintain a dike for the purpose of protecting said city and its inhabitants from damages by flood waters coming from the Arkansas River, in, on, over, through and across the following described lands in Cowley County, Kansas, to-wit: [the legal description of the 5.4 acres of property now owned by the Brutons].

"It is understood and agreed that said dike is to be constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Engineers, which plans and specifications have been examined and approved by first parties."

The easement instrument further provides:

"It is further understood and agreed that second party shall have the right to locate a borrow pit on the above[-]described premises. Said borrow pit to be located on the south side of said dike and adjacent to the river and to be approximately 60 feet wide and 350 feet long.

"It is further understood and agreed that second party shall have the right to take from said borrow pit all dirt necessary to construct said dike across the above described premises and all dirt that may at any time be needed for maintenance work on said dike."

Following the execution of the easement, a dike was constructed, spanning a portion of the Brutons' property, as well as that of other property owners whose properties border the Arkansas River. The dike was constructed in accordance with plans and specifications which were prepared by the United States Army Corps of Engineers (USACE) and examined and approved by the Brutons' predecessors. We note that precise plans and specifications for the construction of the portion of the dike on the Brutons' property apparently do not exist. Instead, the record before us consists of several typical cross-sections of the dike to be constructed along the Arkansas River, which were prepared in 1935 by the USACE.

The City performed minor maintenance and upkeep on the dike (more in the nature of cosmetic rather than structural maintenance) over the next 65 years but made no major improvements to its structure during that time. No dirt had ever been taken by the City from the "borrow pit" to perform its maintenance. According to uncontested testimony of the City's engineering expert in this case, a borrow pit is "an area where soil materials may be excavated to be used in construction of the levee embankment."

In April 2000, the City, in conjunction with the USACE, attempted to enter the Brutons' property in order to make improvements to the dike. When the Brutons prevented the City from accessing the portion of the dike on their property, the City filed a petition in Cowley County District Court, seeking a restraining order against the Brutons and also an order declaring that the City had a lawful easement encompassing the Brutons' property, as well as the authority to construct and maintain the dike on that property.

The district court issued a temporary restraining order in May 2000 to prevent the Brutons from interfering with the City's access to the property to make improvements to the dike.

In June 2000, the Brutons filed their answer to the City's petition, as well as three counterclaims against the City: (1) requesting, pursuant to the Declaratory Judgment Act, that the court enter an order declaring the respective rights of the Brutons and the City under the easement in question; (2) asserting a claim against the City for actionable trespass; and (3) asserting a claim against the City for inverse condemnation. According to the Brutons, the City's improvements would greatly enlarge the existing dike, reducing the size of and eliminating access to the horizontal stretch of land between the dike and the river that the Brutons had previously used to store salvage yard inventory.

The court later granted the City's motion to dismiss the Brutons' counterclaim for actionable trespass for failing to comply with the notice provisions of K.S.A. 12-105b(d). The Brutons do not contest that ruling on appeal.

During the period that the action was pending in district court, the City continued with its work on the dike. In particular, the City's improvements consisted of:

1. "[A]dding a clay blanket and additional fill material on the riverward side of the levee embankment" in order to "[i]ncrease the stability of the levee embankment structure by decreasing the amount of seepage through the levee."

2. "[P]lacing an inspection trench backfilled with compacted clay soil near the riverside toe of the levee, wherever possible connecting with an impervious layer of clay or silty clay in the foundation of the levee" to "[i]ncrease the stability of the levee embankment by decreasing seepage under the levee."

3. Installing "toe drain or relief well system . . . to safely collect and discharge underseepage so that it could not cause piping or internal erosion of foundation materials."

4. "[R]aising the crest elevation of the levee embankment" to "[d]ecrease the probability of erosion of the crest and landside slope materials due to overtopping."

5. "[P]lacing compacted fill material adjacent to the existing levee, and/or flatten the levee embankment slopes" to "[i]ncrease the stability of the levee embankment."

6. "Add[ing] protective material, such as riprap, on the riverside of the levee where the danger of erosion due to the flow of water against the levee or foundation materials is great."

On November 19, 2003, the district court issued a Memorandum of Decision Concerning Scope of Easement. This order found that the language in the easement stating that said " 'dike is to be constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Engineers' " should be "construed to fix the size and location of the dike." Citing a number of authorities from other jurisdictions, the court found that the City's easement in this case could not extend beyond the geographic area covered by the easement in 1935. Thus, the easement did not presently extend, as the City argued, to all of the Brutons' property. In addition, the court's memorandum explained that because the improvements to the levee had been completed, the City's claims in this case were rendered moot. Therefore, the only claims remaining to be decided were the Brutons' counterclaims.

In August 2004, the City submitted a motion to reconsider the conclusions set forth in the court's earlier memorandum concerning the scope of the easement. The City also filed a motion for summary judgment concerning the Brutons' two remaining counterclaims, contending that the dike improvements conducted in

2000-2001 did not exceed the scope of the easement and that the City did not take any additional land from the Brutons.

As part of its brief in support of these two motions, the City included a statement of seven "uncontroverted facts," as required by Supreme Court Rule 141 (2006 Kan. Ct. R. Annot. 203). Attached to its motion, the City provided a number of documents, including the 1935 easement instrument and a report by the City's engineering expert, Eugene Erwin, a retired civil engineer who worked for the USACE for 37 years and who now works as a consulting engineer. Both of these documents were incorporated by reference into the City's statement of facts.

Notably, the expert's report stated that Typical Section No. 3 from the 1935 USACE's Construction Plan provided the most accurate blueprint of the dike on the Brutons' property. In addition, the expert explained in his report that the placement of the borrow pit on the Brutons' property, described in the easement as being "on the south side of the levee adjacent to the river," indicated that "[t]he increment between the riverside toe of the levee embankment ['the bottom of the slope of a levee embankment, where the embankment meets the original ground'] and the beginning of the pit is not excluded from the levee design." The City's expert explained that the flat portion of the property running down to the river was a "seepage berm where the natural material is left in place to provide a barrier to seepage under the levee embankment." The expert further noted that "[t]he geometric footprint of the total levee structure would extend from some distance landward of the actual landside toe of the levee embankment (the landside berm) to the beginning of the borrow pit." The expert concluded that "[t]he berm is a necessary and vital portion of the structure and without it the levee could not perform its intended purpose."

According to the definition provided by the City's expert, a "berm" is

"a nearly horizontal step in the sloping profile of an embankment dam, or a step in a rock or earth cut. In levee design and construction a berm is a nearly horizontal expanse of soil material at either the riverside or landside toe of the levee embankment used to extend the path of underseepage. A natural berm is constructed by leaving a horizontal width from the toe of the levee embankment to

the area where excavation of borrow materials is permitted. Berms may be constructed by placing embankment material at the toe of the levee embankment either to increase the stability of the embankment slope or to lengthen the path of underseepage through the levee foundation."

The Brutons subsequently filed a memorandum in opposition to the City's summary judgment motion, claiming that the City's factual statement was defective under Rule 141, in that it failed to set forth paragraph by paragraph the facts from the easement instrument and the expert's report in the brief's statement of uncontroverted facts. In addition, the Brutons provided a statement of 18 allegedly controverted facts. The essence of the Brutons' response was that the dike as it presently stood was much larger than the original dike and that the improvements added structures to the levee not present in 1935, such as the toe drain and the riprap. Thus, according to the Brutons, the recent improvements by the City exceeded the scope of the easement, resulting in an unlawful taking.

The City responded to the Brutons' memorandum by providing an amended statement of uncontroverted facts that set forth in separate paragraphs all of the City's original statements, as well as the statements from the easement and the expert's report (which were attached to the original factual statement). The City also filed a response to the Brutons' statement of controverted facts, claiming that the facts put forth were either not controverted or not material to the resolution of the claims in this case.

Having received this motion, the Brutons filed a memorandum in opposition to the City's amended statement of uncontroverted facts, claiming that a number of the facts stated by the City were controverted, according to the Brutons' understanding of the easement. The Brutons did not provide any additions to its previous list of controverted facts, other than asserting that a number of the facts stated by the City were in question.

In particular, the Brutons contested the statement by the City's expert that "Typical Section No. 3" provided the most accurate blueprint for the 1935 levee on their property. The Brutons noted that the land depicted in the diagram for Typical Section No. 3 included railroad tracks, which were not located on their property,

and Station 188, which was located on the other side of the highway from the Brutons' property. Thus, the Brutons claimed that Typical Section No. 3 could not accurately describe the levee as it existed on their property.

The Brutons also contested the fact that the berm should be considered part of the levee structure because "[t]he 1935 Easement did not expressly grant to the [City] an easement for a seepage berm." The Brutons asserted that a berm is a *separate structure* from a dike, although they also "[did] not controvert that removal of a berm *may* damage a levee."

The City responded to Brutons' second memorandum in opposition. Attached to its response, the City provided a supplemental report by its engineering expert, which explained why Typical Section No. 3 provided the most accurate depiction of the levee on the Brutons' property. The expert explained that the USACE's construction plan consisted of five "Typical Sections" that showed different possible constructions of dike sections. He stated that the "Typical Sections" were not meant to correspond exactly with any particular area of property, but instead were used as blueprints for several different segments of the levee system. According to the expert, the placement of the borrow pit far away from the levee embankment on the Brutons' property indicates that the USACE used Typical Section No. 3 to design that portion of the levee. In addition, the expert reiterated that the berm "is *an integral part* of the embankment or the cut cross sectional area" of the levee used to reduce seepage. (Emphasis added.) "Since the seepage berm on the Bruton property was an integral part of the levee, it was a part of the footprint of the levee constructed in accordance with the 1935 plans which were examined and approved by the signers of the easement."

A hearing on the City's summary judgment motion was held on October 6, 2004. The court did not rule from the bench but, instead, found that its remaining questions were "issues of law, and not fact." The court therefore stated that it would take the issue under advisement and issue a written opinion. However, before the proceedings concluded, the court asked that the parties stipulate to how much additional height and length the 2000-2001

improvements added to the original levee. The court noted that "the engineers could probably [issue such a report] pretty easily."

Following the hearing, the City requested an additional report from its expert with the specifications requested by the court, as well as scale drawings of the levee structure. The expert provided the City with the supplemental report, concluding that the crest of the current levee structure was 11 feet higher than the 1935 levee structure and that the actual geographic area consisting of both the levee embankment and the seepage berm covered by both the original and improved levee structures was 2.706 acres. To arrive at this figure, the expert explained that the 1935 levee embankment covered .872 acres, while the seepage berm covered 1.834 acres, encompassing a total area of 2.706 acres. The improved levee embankment covers 1.786 acres (an addition of .914 acres), while the seepage berm covers .920 acres (a reduction of .914 acres), for a total of 2.706 acres.

In late November 2004, the City filed a motion for leave to file an additional statement of uncontroverted facts, which consisted of the most recent report of the City's expert. According to the City's motion, the City had provided the Brutons with a copy of the report over a month earlier and had not received any response. After conducting a hearing, the court ruled that the City should be allowed to file its additional factual statement.

In response, the Brutons filed a memorandum in opposition to the City's most recent statement of uncontested facts. The Brutons did not contest the fact that the crest of the current levee was 11 feet higher than the crest of the levee from 1935. Neither did the Brutons contest the expert's figures concerning the area covered by the 1935 and current levee embankments (.872 acres in 1935, compared with 1.786 acres in 2000). Rather, the crux of the Brutons' argument concerning the expert's report was that the report included the area covered by the seepage berm in its calculation of the area covered by the levee structure. The Brutons argued that the berm did not constitute part of the levee; they claimed that *a berm is a separate structure from a dike* and that the 1935 easement did not expressly grant the City authority for a berm. However, the Brutons never presented the court with expert tes-

timony or any other scientific evidence to contradict the City's expert's findings.

*District Court's Opinion*

In a written opinion filed May 9, 2005, the district court granted the City's motion for summary judgment. With regard to the motion for reconsideration, the court's opinion provided that "[i]n the event this decision conflicts with the court's earlier Memorandum of Decision, this decision will control."

Considering the numerous factual statements submitted by the parties in the time between when the City's motions were filed and the issuance of the court's opinion, the district court found it could "separate the wheat from the chaff," in the many statements, and so set forth a list of 22 "controlling facts." In particular, the court found that all typical sections of the 1935 plans "indicate a geometrical footprint which encompasses the levee embankment, berm and borrow pit." The court also found that "[a] seepage berm is a necessary and vital component of a total levee structure, and without it the levee could not perform its intended purpose. That was the case in 1935 just as it is today."

Proceeding with its analysis, the district court found that the language of the 1935 easement was ambiguous. It contrasted the easement's language stating that the City may " 'construct and maintain a dike for the purpose of protecting said city and its inhabitants from damage by flood waters' " with the language in the next paragraph stating that " 'said dike is to be constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Corp[s] of Engineers.' " Considering these two sections, the court found that the standard for maintenance in the easement was unclear.

Because it found the language of the easement to be ambiguous, the court stated that it "must interpret the easement's terms in light of the apparent purpose of the contract as a whole, the rules of contract construction and, if available, extrinsic evidence of intent and meaning." After undergoing this analysis, the court found that because "[t]he change in the configuration of the levee in this case is within the easement's stated purpose," the changes were

not material. Thus, the court concluded that the 2000-2001 levee improvements by the City did not breach the easement agreement and granted the City's motion for summary judgment.

The Brutons appealed.

*Court of Appeals' Opinion*

The Court of Appeals reversed the district court's grant of summary judgment, holding that "the district court erred in finding the instrument ambiguous, focused exclusively on the stated purpose and ignored the specific express restrictions imposed on the scope and location of the easement, and failed to recognize that a genuine issue of material fact precluded summary judgment." *City of Arkansas City v. Bruton*, 36 Kan. App. 2d 42, 47-48, 137 P.3d 508 (2006).

In particular, the Court of Appeals found that the district court erred when it found that the easement in question was ambiguous. 36 Kan. App. 2d at 48. Examining the provisions in the easement relating to maintenance (which the district court found to create ambiguity), the appellate court stated that it

"fail[ed] to conceive how these provisions could be subject to more than one meaning; the parties clearly expressed the scope and location of the easement by reference to specific plans and specifications, and they further expressed the purpose of the rights obtained by the City to be flood protection. Because the instrument was not subject to more than one meaning, . . . the district court erred in concluding that it was ambiguous. [Citation omitted.]" 36 Kan. App. 2d at 48.

In light of its finding that the language in the instrument was not ambiguous, the court rejected the City's claims regarding contract construction that the scope and location provisions of the easement should be construed according to the easement's express purpose. The court found that use of such a maxim was "limited to those instruments that do not specifically limit the scope of the right." 36 Kan. App. 2d at 49. The court explained that changes to the 1935 dike "must be examined *both* for consistency with those 1935 plans and specifications and with the expressed purpose that the dike protect the inhabitants of the City from flood damage." 36 Kan. App. 2d at 51. Because the district court construed the instrument "consistent with its stated purpose but without regard

to its express limitations on location," the Court of Appeals held that the district court's decision was improper. 36 Kan. App. 2d at 50.

The Court of Appeals also found that the district court erred in concluding that there were no genuine issues of material fact precluding summary judgment. In particular, the court noted that its conclusion that the easement instrument was not ambiguous "frame[d] a key material issue of fact: Do the City's improvements of 2000 constitute " 'maintenance' " " 'in accordance with the plans and specifications' " that were approved by the parties in 1935?" 36 Kan. App. 2d at 54. The court found that the City had argued only that the improvements to the levee were consistent with the purpose of the original levee, not that they constituted maintenance of the original dike. 36 Kan. App. 2d at 54. The court stated that this question "will likely require engineering opinions from both parties and will undoubtedly be contentious." 36 Kan. App. 2d at 54.

In framing this issue, however, the court recognized that the Brutons had presented no expert engineering testimony "either in support of their positions or in response to the City's positions" and that "the meaning and effect of engineering plans and specifications are difficult if not impossible to ascertain in the absence of expert assistance." 36 Kan. App. 2d at 53. However, the court found that although the Brutons' positions were fairly weak when compared with the opinions of the City's expert, it was not the district court's role to weigh the parties' factual positions during consideration of a summary judgment motion. 36 Kan. App. 2d at 53-54. Thus, the court found that "the Brutons' response to the challenged material fact regarding design typicality [relating to Typical Section No. 3], although weak, was sufficient to preclude summary judgment." 36 Kan. App. 2d at 54.

Finally, the court concluded that "the sheer volume of ever-shifting fact statements and responses were indicative of genuine issues of material fact that precluded summary judgment." 36 Kan. App. 2d at 54. Examining the repeated statements of facts by the parties leading up to the district court's ruling on the City's summary judgment motion, the court explained that its "attempt to

discern an accurate picture of uncontroverted facts is obfuscated by multiple submissions, amended fact statements, shifting positions, and supplemental expert reports intended both to respond and to argue factual matters." 36 Kan. App. 2d at 51. The court then concluded

"that the manner in which the parties approached summary judgment was not in keeping with the letter or spirit of Supreme Court Rule 141 (2005 Kan. Ct. R. Annot. 205). The Rule clearly contemplates a singular memorandum by the movant with uncontroverted contentions of fact, followed by a singular responsive memorandum by the nonmoving party that can include controversions of the movant's factual contentions, together with statements of additional issues of material fact precluding summary judgment, and these additional fact statements may warrant a response by the moving party. No further memoranda containing amended statements and responses are contemplated, nor is it the better practice to permit ever-shifting amendments, refinements, and argumentative posturing prior to summary motion resolution." 36 Kan. App. 2d at 52-53.

The court found this repeated filing and amending of factual statements to be "evidence that material issues of fact precluded summary judgment and warranted a trial on the merits." 36 Kan. App. 2d at 53.

INTERPRETATION OF THE EASEMENT AS IT RELATES TO THE RIGHTS OF THE PARTIES

The district court found the 1935 easement to be ambiguous, thereby allowing it to apply rules of construction favoring the public purpose expressed to protect the " 'city and its inhabitants from damage by floodwaters coming from the Arkansas River.' " The Court of Appeals concluded that the 1935 easement was not ambiguous, requiring a construction consistent with the expressed intent of the original parties to construct and maintain the dike in accordance with the 1935 plans and specifications. As we consider both decisions and various contentions of the parties in this appeal, we apply a familiar standard of review that is unlimited.

*Standard of Review*

"The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial

court, an appellate court may construe a written contract and de-termine its legal effect. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). The question of whether a written instrument is ambiguous is a ques-tion of law subject to de novo review. *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002).

*Analysis*

We have previously held that "[t]he character and extent of the rights created by a grant of easement is determined by construction of the language of the grant and by the extent of the use made of the dominant tenement at the time of the grant. (Tiffany, Law of Real Property, 3d Ed., Vol. 3, § 802; 28 C.J.S. Easements, § 26, p. 680.)" *Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 531, 441 P.2d 802 (1968). Generally, if a written instrument has clear lan-guage and can be carried out as written, rules of construction are not necessary. *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005, 974 P.2d 569 (1999); see also *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 680, 829 P.2d 884 (1992) ("As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of con-struction.").

The Brutons assert that the Court of Appeals correctly con-cluded that the 1935 easement is unambiguous because the lan-guage of the easement clearly states that any maintenance must be conducted in accordance with the existing easement's plans and specifications from 1935. The City argues that the easement's lan-guage is subject to more than one interpretation regarding the City's right to maintain the dike, but that by applying accepted rules of contract construction favoring the easement's stated public purpose the meaning of the easement instrument becomes appar-ent. Thus, the City contends that the Court of Appeals erred when it did not liberally construe the easement in favor of its public purpose.

The protection of the public from flooding is vitally important. Not only is the public benefit of such an easement apparent from the nature of dikes and the region's history of flood damage from

the Arkansas River, but this public purpose is underscored by the express language of the 1935 easement. However, contrary to the City's claims, the principles of construction that emphasize the importance of interpreting contracts in favor of the public interest only apply when a document supports more than one reasonable interpretation. See *KPERS v. Russell*, 269 Kan. 228, 236, 5 P.3d 525 (2000). If this court concludes that the easement is unambiguous, we necessarily also must conclude that the easement's language does not support other reasonable interpretations. In that case, the "legal principles" and rules of interpretation cited by the City would not apply.

Relevant to our analysis, the easement provides:

"That . . . first parties [the property owners] hereby grant, sell, warrant and convey to second party [the City], its successors and assigns forever, a right of way and easement with the right, privilege and authority to said party of the second part, its successors and assigns to *construct and maintain a dike for the purpose of protecting said city and its inhabitants from damages by flood waters coming from the Arkansas River*, in, on, over, through and across the following described lands in Cowley County, Kansas, to-wit: [the legal description of the Brutons' property].

"It is understood and agreed that *said dike is to be constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Engineers, which plans and specifications have been examined and approved by first parties*." (Emphasis added.)

As the Court of Appeals explained in its opinion, the use of the phrase "said dike" in the second paragraph of the easement indicates that the restriction described there—that it must be "constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Engineers" and approved by the Brutons' predecessors—adds an additional limitation to the City's right to "construct and maintain" the dike, as described in the first paragraph. The easement incorporates by reference the 1935 plans and specifications of the USACE, and it expressly provides that any later maintenance of the dike must be limited to the scope and location of the easement, as described in those plans. See *Bruton*, 36 Kan. App. 2d at 48.

The quoted language from the easement indicates without ambiguity that there are two requirements for any construction and

maintenance of the dike: (1) The dike must be maintained for the purpose of protecting the public from flooding, and (2) the dike must be maintained "in accordance with" the 1935 plans and specifications. Because the language of the easement is clear, the maxims of contract interpretation cited by the City do not apply. See *Russell*, 269 Kan. at 236; *Decatur County Feed Yard, Inc.*, 266 Kan. at 1005.

In spite of the plain language of the easement, the City urges this court to apply a different standard as to the interpretation of this particular easement, which contains an *express public purpose*—that the dike must be constructed and maintained "for the purpose of protecting said city and its inhabitants from damages by flood waters coming from the Arkansas River." In the absence of any language in the easement to support its position, the City would have this court ignore express provisions agreed to by the original parties or to at least liberally construe the easement consistent with the public purpose expressed, even if such a construction may conflict with other provisions of the easement. The City has cited no support for this position, nor have we been able to find any support for the City's position.

Chapter 4 of the Restatement (Third) of Property: Servitudes (1998) deals explicitly with the interpretation of servitudes. Section 4.1 of that chapter provides:

"(1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created."

Official Comments to this section explain that "[t]he circumstances of the mode of creation of the servitude affect the manner in which it is interpreted. *If the servitude is expressly created, the expressed intentions of the parties are of primary importance.*" (Emphasis added.) Restatement (Third) of Property: Servitudes § 4.1, comment a. Comment d discusses expressly created servitudes in some detail:

"Expressly created servitudes are typically the result of contractual transactions, and the principles set forth in Chapter 9 of the Restatement Second of Contracts should be applied to determine the intent of the parties and the meaning of the

terms expressed. Because servitudes are interests in land, subject to the Statute of Frauds and the recording acts, *heavy emphasis is placed on the written expressions of the parties' intent.* The fact that servitudes are intended to bind successors to interests in the land, as well as the contracting parties, and are generally intended to last for an indefinite period of time, *lends increased importance to the writing because it is often the primary source of information available to a prospective purchaser of the land.*" (Emphasis added.) Restatement (Third) of Property: Servitudes § 4.1, comment d.

See also Restatement (Third) of Property: Servitudes § 4.10 (*"Except as limited by the terms of the servitude* determined under § 4.1, the holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude." [Emphasis added.]).

The City asks this court to adopt an approach for applying the express purpose of the easement before us in conjunction with Restatement (Third) of Property: Servitudes § 4.1(2), which states that "[a]mong reasonable interpretations, that which is more consonant with public policy should be preferred." Such an approach would ignore the clear language of the easement. The unambiguous language of the easement simply does not support more than one interpretation. Instead, Restatement (Third) of Property: Servitudes § 4.1, comment d explains: "[H]eavy emphasis is placed on the written expressions of the parties' intent."

The original parties to the easement determined that the easement was to be maintained to protect the public *and* in accordance with the 1935 plans. Because "the writing . . . is often the primary source of information available to a prospective purchaser of the land," we may not read the easement here in such a way that nullifies an express provision of the writing—that "said dike is to be constructed and maintained in accordance with plans and specifications prepared by the U.S. Army Engineers, which plans and specifications have been examined and approved by first parties."

The provisions of the Restatement discussed above reflect a similar approach to that taken by Kansas courts in the construction of written contracts—namely, that "[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering

the entire instrument from its four corners." *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000). Nowhere in the Restatement or in Kansas case law do we find support for the City's contention that an express statement of public purpose must override other express provisions of an easement not directly in conflict that place limitations on the use of the easement.

The two express limitations on the City's easement as described in the clear language of the easement instrument—that the dike be constructed and maintained according to the 1935 plans and specifications of the USACE and that the dike be constructed and maintained to protect the City and its inhabitants against floods— are not mutually exclusive. Any improvements to the dike must satisfy both of these express limitations. The Court of Appeals correctly concluded that the clear language of the easement instrument requires that any improvements to the existing levee structure "must be examined *both* for consistency with those 1935 plans and specifications and with the expressed purpose that the dike protect the inhabitants of the City from flood damage." *Bruton*, 36 Kan. App. 2d at 51.

## SUMMARY JUDGMENT

In both their inverse condemnation claim and their request for a declaratory judgment, the Brutons argue that the City exceeded the scope of the easement by enlarging the existing dike beyond its original geographic area, resulting in a taking without compensation of land owned by the Brutons. The question of whether there was a taking by the City depends upon whether the City constructed improvements to the dike upon the easement originally granted in 1935, or whether such improvements were constructed upon land outside the easement so granted. Therefore, our determination of whether summary judgment was appropriate turns on our analysis of the Brutons' request for a declaratory judgment concerning the rights of the parties as to the land covered by the improved dike.

In order to show that the City's 2000-2001 improvements to the dike were within the City's lawful authority under the 1935 easement, the City was required to establish that the improvements

constituted maintenance, in accordance with the 1935 plans and specifications of the USACE and the express purpose of the dike, to protect the City and its inhabitants against floods. There is no dispute that the City's purpose in improving the dike was to protect the public against flooding. Moreover, neither party contests the lower courts' findings that to fall within the scope of the original easement, the improved dike's geometric footprint may not exceed that of the original dike constructed in 1935. We must resolve whether there remain genuine issues of material fact as to (1) whether the improvements to the levee were confined to the scope and location of the 1935 dike and (2) whether the improvements constituted maintenance in accordance with the 1935 plans and specifications.

*Standard of Review*

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

*Supreme Court Rule 141*

Before considering the merits of the parties' arguments regarding whether summary judgment was proper in this case, we must briefly address the Court of Appeals' finding that the submission of numerous statements of uncontested facts by the City (including two supplemental reports by the City's expert) was not "in keeping with the letter or the spirit" of Supreme Court Rule 141 (2006 Kan. Ct. R. Annot. 203) and indicated that material facts exist that precluded summary judgment. *Bruton*, 36 Kan. App. 2d at 52. The Court of Appeals explained:

"The Rule clearly contemplates a singular memorandum by the movant with uncontroverted contentions of fact, followed by a singular responsive memorandum by the nonmoving party that can include controversions of the movant's factual contentions, together with statements of additional issues of material fact precluding summary judgment, and these additional fact statements may warrant a response by the moving party. No further memoranda containing amended statements and responses are contemplated, nor is it the better practice to permit ever-shifting amendments, refinements, and argumentative posturing prior to summary motion resolution.

"For any party to resubmit new or additional statements supported by supplemental expert reports is akin to controverting statements supported by a deposition with a contemporary and contradictory affidavit of the deponent, a practice long prohibited. [Citations omitted.] We deem the numerous submissions of amended and supplemental materials as evidence that material issues of fact precluded summary judgment and warranted a trial on the merits. It is no wonder that the district court found it difficult to sort out these materials in the context of a summary judgment proceeding. Cases are not to be tried by successive summary judgment motions." 36 Kan. App. 2d at 52-53.

Supreme Court Rule 141, which discusses the procedure for summary judgment motions, provides:

"No motion for summary judgment shall be heard or deemed finally submitted for decision until:
  "(a) The moving party has filed with the court and served on opposing counsel a memorandum or brief setting forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant (with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the record); and
  "(b) Any party opposing said motion has filed and served on the moving party within twenty-one (21) days thereafter, unless the time is extended by court order, a memorandum or brief setting forth in separately numbered paragraphs (corresponding to the numbered paragraphs of movant's memorandum or brief) a statement whether each factual contention of movant is controverted, and if controverted, a concise summary of conflicting testimony or evidence, and any additional genuine issues of material fact which preclude summary judgment (with precise references as required in paragraph [a], *supra*).
  ". . . In determining a motion for summary judgment the judge shall state the controlling facts and the legal principles controlling the decision in accordance with Rule 165." (2006 Kan. Ct. R. Annot. 203-04.)

Here, the City included a list of uncontroverted facts with its original memorandum in support of its motion for summary judgment. The Brutons responded that the City's original list did not comply with Rule 141 because it did not list paragraph by paragraph the facts in the easement instrument and in Erwin's report; they also provided a list of allegedly controverted facts.

In response, the City filed an amended statement of controverted facts that complied with the Brutons' request. It also responded to the Brutons' contested facts. The Brutons later responded to the City's amended statement, and the City replied to the Brutons' response, using a supplemental report by its expert to explain his earlier statements in greater detail. The Brutons responded to this response.

After the hearing, at the trial court's request, the City's expert provided yet another statement concerning the geographical area covered by the dike. Because the Brutons. did not respond after the City supplied them with its expert's report, the City moved the court to allow it to file these additional findings. The court granted this motion.

This is a complex case, involving complex facts. It is to be expected, in such cases, that litigation will become heated. It is not uncommon in such instances that parties may submit long "factual statements" that also include conclusory statements and legal arguments. However, contrary to the Court of Appeals' conclusion, this fact alone does not make summary judgment improper under Rule 141. In fact, Rule 141 provides that a district court should state the facts it finds controlling when issuing its decision—indicating that not all facts listed by the parties (even if controverted on some level) will be material to its decision.

The district court noted that it believed it could "separate the wheat from the chaff in the City's statement of uncontroverted facts," by sorting out conclusory statements and statements that led to improper legal conclusions. It also found that it was able to sort out the facts that were material to the resolution of this case. The resolution of procedural questions is not specifically addressed by the Supreme Court Rules, and the Rules of Civil Procedure are left to the sound discretion of the trial court. The fact that parties

claim that more facts are "uncontroverted" than that required by Rule 141 does not render summary judgment improper when the trial court undergoes the correct legal analysis and identifies that the facts necessary to decide such legal questions have not been challenged.

Before the district court, the Court of Appeals, and this court, the actual material facts necessary to determine whether the City had exceeded the scope of its authority in conducting improvements on the dike are: (1) whether the improvements to the dike were confined to the scope and location of the 1935 dike and (2) whether the improvements constituted maintenance. The sheer number of statements of facts provided in this case, although many, does not alone support a conclusion that material issues remain or that summary judgment was improper. Suffice it to say that the Court of Appeals erred when it concluded that the parties in this case violated Rule 141 and that the number of filings indicate that there remain unresolved material facts. Thus, under our unlimited standard of review, we must consider the merits of whether the district court erred in granting summary judgment in favor of the City.

*Analysis*

The Brutons present two arguments as to why the improvements exceeded the scope of the 1935 instrument: (1) The improved dike as it currently stands is much taller and broader than the original dike, taking up more geographic area than the original dike and showing that additional land has been taken from them; and (2) the recent changes to the dike structure are so substantial that they cannot be considered "maintenance," but must be viewed as constructing a "new levee."

The City responds that the Brutons have not adequately controverted the scientific or technical opinions of its expert that the improved dike does not take up more area than the original easement and that the improvements were necessary maintenance in order to effectuate the express purpose of the dike. According to the City, the Brutons' arguments concerning the correct interpretation of the 1935 design plans and what may be considered "main-

tenance" are based solely on affidavits by the Brutons themselves and on unsupported assertions by their counsel. The City contends that nonexpert affidavits and arguments do not controvert otherwise uncontradicted expert opinions on issues that require technical expertise.

Before considering the merits of the above contentions, it is helpful to briefly discuss the nature of the USACE's plans and specifications relating to the construction of the 1935 dike that are part of the record before this court. We again note that precise plans and specifications for the construction of the dike on the Brutons' property are not available. Whether such precise plans and specifications ever existed is unknown. What is known and what was admitted into evidence in this case are five "Typical Sections" prepared by the USACE that represent portions of the dike constructed along the Arkansas River in 1935. The City's engineering expert testified that one of these sections, Typical Section No. 3, best represented the plans and specifications for the dike constructed on the Brutons' property. The Brutons contested this fact by way of their own personal affidavits denying the applicability of Typical Section No. 3 to the portion of the dike on their property.

The Brutons did not present the court with expert testimony or other scientific evidence on any matter in this case; in particular, the Brutons did not present any opposing expert interpretation of the 1935 engineering plans and specifications. Our resolution of this case therefore turns on whether the testimony of the City's expert that Typical Section No. 3 best represents the plans for construction of the original dike on the Brutons' property and that the improvements to the dike constituted maintenance was "uncontroverted" for summary judgment purposes or whether that testimony was "controverted" by the Brutons' nonexpert opinions.

Prior Kansas cases indicate that when the resolution of a case turns on facts that are highly technical or scientific or requires expertise outside the scope of common knowledge, expert testimony on such subjects may not be controverted except by the opinions of other experts. For example, we have held in medical malpractice actions that if the plaintiff alleges the physician erred

in the diagnosis, choice of treatment, or application of medical expertise, expert medical testimony as to the accepted standard of medical care within the defendant's community is usually required for a proper determination of negligence. See *Webb v. Lungstrum*, 223 Kan. 487, Syl. ¶¶ 1-2, 575 P.2d 22 (1978); see also *Williamson v. Amrani*, 283 Kan. 227, Syl. ¶ 2, 152 P.3d 60 (2007) (stating that in consumer protection cases, "proof of an allegation that a physician has willfully failed to state a material fact or has willfully concealed a material fact requires expert testimony to establish the disclosures that would be made by a reasonable medical practitioner under the same or like circumstances").

In *Seaman U.S.D. No. 345 v. Casson Constr. Co.*, 3 Kan. App. 2d 289, 293, 594 P.2d 241 (1979), the Court of Appeals applied the same requirement for expert testimony to cases involving the architectural profession, stating:

"One purpose of the community medical standard and its requirement of expert testimony is to educate the fact finder as to otherwise alien terminology and technology and thus preclude his rendering judgment on something he knows nothing about. We have no qualms in applying a similar standard to the architectural profession. We agree that architectural procedures are sufficiently technical and outside the realm of ordinary knowledge to warrant application of an 'architectural community standard' in most instances."

Applying this standard, the *Casson Construction* court determined that drainage and slope specifications for sidewalks in a case alleging negligent construction of the sidewalks was a subject that could not be disputed except by expert testimony. The court explained:

"The facts of the drainage matter . . . are too technically complicated to be resolved by mere application of this commonly known fact. . . . Considering these facts and the size of the surface area to be drained, we do not think it is within the common knowledge of laymen to decide whether such specifications were proper. This conclusion, together with the testimony of three architects that the plan was in accordance with local architectural standards and the absence of any testimony by an architect to the contrary, convinces us that the trial court erred in finding directly opposite to these experts' opinion testimony." 3 Kan. App. 2d at 294.

Although these previous cases dealt with allegations of professional negligence, the motivation behind the courts' requirement of expert testimony was "to educate the fact finder as to otherwise

alien terminology and technology and thus preclude his rendering judgment on something he knows nothing about." 3 Kan. App. 2d at 293. This consideration is equally applicable in cases that do not involve negligence but do involve highly technical fields or expertise outside the range of common knowledge. This issue is treated in 31A Am. Jur. 2d, Expert and Opinion Evidence § 116, pp. 139-40, where it states:

"[I]f the subject matter is not solely for experts, uncontroverted opinion testimony is not conclusive, regardless of whether it comes from an expert or a lay witness. Even if several competent experts concur in their opinion and no opposing expert evidence is offered, the trier of fact is still bound to decide the issue on its own fair judgment, assisted by the statements of the experts. Expert opinions must be given consideration, however, and must receive such weight, in view of all the circumstances, as reasonably attaches to them.

"There are circumstances in which expert testimony is of great value, and in those situations expert testimony may have a weight approximating that of conclusiveness. For example, *the testimony of an expert witness on a subject calling for expert opinion is conclusive to the extent that it may not be contradicted by the testimony of a nonexpert witness.* Common knowledge may not be exercised as against the uncontradicted testimony of an expert." (Emphasis added.)

As these prior cases and the above commentary demonstrate, the determinative question in this case is whether the design aspects of a dike and the actions needed to maintain the dike in working order are "subject[s] calling for expert opinion." If the design of the dike or the maintenance requirements are not subjects requiring expert opinion, then the Court of Appeals correctly determined that the Brutons raise factual questions that preclude a grant of summary judgment. If, however, the issues in this case *do* require expert opinion, then the testimony of the City's expert may not be controverted by the Brutons' nonexpert opinion and the expert's testimony may be considered conclusive, absent a contrasting opinion offered by another expert in the field. If this is the case, the district court correctly granted summary judgment in favor of the City, even though it incorrectly found that the easement was ambiguous.

In light of this background, we turn to our analysis of whether genuine issues of material fact exist as to whether the recent improvements to the portion of the dike on the Brutons' property (1)

were confined to the scope and location of the 1935 dike and (2) constituted maintenance.

*1) Did the City's recent improvements use more of the Brutons' land than was used in the original dike?*

The Brutons claim that a factual issue exists as to whether the City's recent improvements to the dike structure use land that was not a part of the original dike structure in 1935. In particular, the Brutons claim that the location of the dike once completed in 1936 was identified and the City's recent improvements that moved the dike's riverside toe 103 feet toward the river not only resulted in a new dike, but also resulted in an uncompensated taking of land from the Brutons that was used by them to store their salvage yard inventory.

In response to this allegation, the City presented an affidavit of its engineering expert that the dike structure not only consisted of the levee embankment—the mound of earth that was heightened and broadened with the City's 2000-2001 improvement—but also the borrow pit identified in the easement and the berm that extended from the borrow pit under the levee embankment to provide a barrier for water seepage and to prevent damage to the embankment. The expert stated that because the berm was part of the dike as it existed in 1935 and because the City's recent improvements to the dike broadened the levee embankment on the berm without using any additional land outside of the embankment, berm, and borrow pit, the original and improved dikes' geographic footprints are identical (although the improved dike looks much larger). The expert further stated that "[t]he berm is a necessary and vital portion of the structure and without it the levee could not perform its intended purpose."

As noted above, no precise design specifications for the portion of the dike constructed on the Brutons' property in 1935 exist. Instead, the 1935 USACE's construction plan for the dike consists of engineering plans and specifications for five representative sections, drawn to scale, with each portion of the actual dike constructed along the Arkansas River corresponding to one of these sections. The opinion of the City's expert was based on his study

of the five "typical sections" and his conclusion that Typical Section No. 3 best represented the portion of the dike actually constructed on the Brutons' property. The expert used Typical Section No. 3 to illustrate that the horizontal piece of land between the riverside toe of the levee embankment and the river (which had been used by the Brutons previously to park automobiles from the salvage yard) was actually a natural berm and part of the levee structure. From this drawing, the expert explained that "[t]he geometric footprint of the total levee structure would extend from some distance landward of the actual landside toe of the levee embankment (the landside berm) to the beginning of the borrow pit."

The Brutons attempted to controvert the expert's testimony by denying that Typical Section No. 3 is representative of the plans for the dike actually constructed on their property. They point to a railroad inclusion on Typical Section No. 3 and state that the railroad referred to in the 1935 plans is located not on their property, but is instead located far west of their property. They also point to the location of a highway in the engineering plans to indicate that the portion of the dike diagramed in Typical Section No. 3 does not correspond to the portion of the dike on their land.

According to the Brutons, because Typical Section No. 3 does not provide an accurate representation of the dike on their property, a genuine issue of material fact exists as to whether the berm was included in the original dike structure in 1935. The Brutons do admit that a berm, if removed from a dike, may damage the dike and prevent it from performing its intended purpose of protecting against flooding.

The Brutons' arguments to "controvert" the expert's testimony in this case illustrate the need for expert opinion in a case that involves interpretation of highly technical drawings and design specifications. The assertions put forth by the Brutons relating to Typical Section No. 3 reveal a fundamental misunderstanding of the representative nature of the five typical sections. The existence of a railroad on the diagram or the placement of the highway is inconsequential, as the drawings are used as general representations of the five different designs for portions of the dike along the Arkansas River. Interpretation of the engineering plans and spec-

ifications is not something that is within the common knowledge of the public; it is a matter that requires the technical explanation of an expert in the field.

Similarly, the Brutons' blanket denial that the berm constitutes part of the dike system, supported only by the Brutons' own brief affidavits and provided without expert opinion or other technical evidence, cannot controvert the opinion of an expert in the specialized field of dike design. The technical jargon used in this field and the accepted notion that a dike or levee consists not only of an embankment but also of a berm to prevent damage to that embankment are not areas that may be called into question by lay assertions. The City's expert's opinion that the horizontal land in question in this case is a berm that is essential to the operation of the dike system and that was present in the original 1935 design specifications has not been adequately controverted by the Brutons to prevent the grant of summary judgment on this issue.

Without the benefit of an expert opinion to controvert the opinions of the City's expert engineer concerning the representative plans and Typical Section No. 3 and without the benefit of expert opinion questioning the existence of the natural berm as an integral part of the 1935 dike constructed on the Bruton property, we are not in a position to say that these blanket denials by the Brutons controverted the expert opinion of the City's engineering expert. We conclude that expert testimony is essential in resolving the issues before the district court and this court.

The City's expert testified that the amount of land covered by the improved dike system (consisting of the embankment, berm, and borrow pit) is no different from the land used in the original dike system as designed in 1935. The Brutons' only response to this finding by the expert was their summary denial that the berm is part of the dike system based on the reasons outlined above. Because the Brutons have not provided any expert opinion or other technical data to support their position, we find that the opinion of the City's expert is conclusive and has not been controverted.

The representative plans are technical in nature and the existence or lack of the existence of a berm in the 1935 plans is not a subject within the knowledge of a lay person. Under the circum-

stances presented, we are convinced that the issues have not been controverted by the Brutons' general denial and that the issues would be resolved only by resort to additional expert opinion in this technical area of dike construction, which the Brutons did not provide. Thus, we conclude that there is no genuine issue of material fact that the property upon which the dike is presently placed was within the property included in the original grant of easement or that the improvements performed by the City did not involve the taking of any property other than property used in the original easement.

*2) Did the improvements to the levee structure constitute maintenance within the meaning of the easement?*

We have concluded that the improved dike system does not include any property different from that originally used in the original dike structure from 1935. We have also concluded that the easement instrument unambiguously states that the City may perform any maintenance on the dike as long as the maintenance is conducted in accordance with the USACE's 1935 plans and specifications and for the purpose of protecting the City and its inhabitants against floods. The Brutons do not question the fact that the City's improvements to the dike structure in 2000-2001 were for the purpose of providing greater protection against flooding from the river. Instead, they contend that the recent improvements by the City (which involved increasing the dike's height and breadth and adding additional material such as riprap and a toe drain) went beyond maintenance in accordance with the 1935 plans and actually resulted in the construction of a new dike on their property.

From 1935 until 2000, only minor improvements, mostly cosmetic in nature (such as mowing the grass), were made to the dike. However, as our previous discussion indicates, significant improvements were made to the dike in 2000-2001 on the land subject to the original easement. The City's expert described these improvements in detail in his reports and also described why he found that the improvements were necessary to prevent damage to the existing dike structure. The expert explained that the City's work on the dike consisted of the following "items of repair or maintenance

used to correct the deficiencies" in the existing dike identified by the USACE:

1. "[A]dding a clay blanket and additional fill material on the riverward side of the levee embankment" in order to "[i]ncrease the stability of the levee embankment structure by decreasing the amount of seepage through the levee."

2. "[P]lacing an inspection trench backfilled with compacted clay soil near the riverside toe of the levee, wherever possible connecting with an impervious layer of clay or silty clay in the foundation of the levee" to "[i]ncrease the stability of the levee embankment by decreasing seepage under the levee."

3. Installing a "toe drain or relief well system . . . to safely collect and discharge underseepage so that it could not cause piping or internal erosion of foundation materials."

4. "[R]aising the crest elevation of the levee embankment" to "[d]ecrease the probability of erosion of the crest and landside slope materials due to overtopping."

5. "[P]lacing compacted fill material adjacent to the existing levee, and/or flatten the levee embankment slopes" to "[i]ncrease the stability of the levee embankment."

6. "Add[ing] protective material, such as riprap, on the riverside of the levee where the danger of erosion due to the flow of water against the levee or foundation materials is great."

Our analysis of whether these recent improvements to the dike by the City may be considered "maintenance" is twofold: First, we must consider whether the City's recent improvements may be considered maintenance in a general sense. Second, if the improvements would generally be considered maintenance, we must determine whether such maintenance was done in accordance with the 1935 plans and specifications, as required by the easement.

Webster's New Twentieth Century Dictionary Unabridged 1087 (2d ed. 1956) defines "maintain" in the following manner: "2(a) to keep in existence or continuance; as food *maintains* life; (b) to keep in a certain condition or position, especially of efficiency, good repair, etc.; to preserve; as, the state *maintains* the roads."

The Restatement provides a similarly broad definition of the maintenance of easements. The Restatement (Third) of Property: Servitudes § 4.10 (1998), which defines the use rights conferred by a servitude, takes a practical approach to defining the ways a

holder of an easement may use the land. This section recognizes that "[t]he manner, frequency, and intensity of the use [of an easement] may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude." Restatement (Third) of Property: Servitudes § 4.10. The comment to this section explains that the flexible rule "promotes productive land use without imposing additional burdens on the servient estate." Restatement (Third) of Property: Servitudes § 4.10, comment e.

The Restatement (Third) of Property: Servitudes § 4.13 specifically relates to an easement holder's duties of repair and maintenance, and provides:

"Unless the terms of a servitude determined under § 4.1 provide otherwise, duties to repair and maintain the servient estate and the improvements used in the enjoyment of a servitude are as follows:

(1) The beneficiary of an easement or profit has a duty to the holder of the servient estate to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude that are under the beneficiary's control, to the extent necessary to

(a) prevent unreasonable interference with the enjoyment of the servient estate, or

(b) avoid liability of the servient-estate owner to third parties."

The comment corresponding to this subsection explains that "[u]nder the rule stated in § 4.10, the holder of an easement or profit is entitled to make any use of the servient estate that is reasonable for enjoyment of the servitude, *including the right to construct, improve, repair, and maintain improvements that are reasonably necessary.*" (Emphasis added.) Restatement (Third) of Property: Servitudes § 4.13, comment b.

We conclude that the term "maintenance" as defined by the above authorities is broad enough to encompass the City's recent improvements to the dike. The final question before us is therefore whether these improvements were conducted "in accordance with plans and specifications prepared by the U.S. Army Engineers" from 1935.

Our review of the Brutons' arguments as to why the recent improvements cannot constitute maintenance within the meaning of

the easement reveals that they are no different from the arguments raised regarding the location of the easement. The Brutons argue that the physical alterations to the dike structure (that the improved dike is much taller and broader and includes riprap and a toe drain) cannot be considered maintenance because the improved levee looks much different. However, the fact that the dike "looks different" is largely irrelevant to the analysis. Instead, the question is whether the improvements were in accordance with the plans and specifications for the original dike, as constructed in 1935.

The City's expert opined that the most recent improvements were made in accordance with the plans and specifications, using Typical Section No. 3 to illustrate the design contemplated for the portion of the dike on the Brutons' property. In addition, he explained that the addition of the riprap and toe drain, though not part of the original structure in 1935, were necessary in order to prevent erosion of the dike's embankment and damage from underseepage.

The Brutons do not present any expert opinion or other evidence to controvert the interpretation of the 1935 plans by the City's expert. Instead, they rely on denials based on their own affidavits and point to the existence of the toe drains and riprap, claiming that the *addition* of these items cannot constitute *maintenance* of the existing dike.

We first note that the Brutons' argument regarding the riprap and toe drain reflects a misunderstanding of the law relating to the maintenance of easements. After an easement is created, the law recognizes that "[t]he manner, frequency, and intensity of the use [of an easement] may change over time to take advantage of developments in technology." Restatement (Third) of Property: Servitudes § 4.10. The holder of an easement's right to maintain the easement includes "the right to construct, improve, repair, and maintain improvements that are reasonably necessary." Restatement (Third) of Property: Servitudes § 4.13, comment b. The addition of riprap and the toe drain to the dike are fully within the City's rights to maintain that easement.

The language of the easement itself does not alter this broad definition of "maintenance"; it provides only that the maintenance

on the dike (which encompasses the additions) must be "in accordance with" the 1935 plans—not that the improvements to the dike are limited to the structures identified in those plans. Contrary to the Brutons' argument, the fact that the plans consisted of only representative drawings of typical dike sections illustrates that the plans recognized the need for flexibility in the design and maintenance of the dike constructed.

As to the question of whether the change in size of the dike embankment may be considered maintenance in accordance with the 1935 plans and specifications, we are again convinced that the expert testimony in this case, as well as the many drawings and reports by the City's expert, establish that the new improvements to the dike were needed in order to maintain the dike in accordance with the 1935 plans. We are not in a position to credit the Brutons' general denials in the face of the expert opinion offered by the City, and we resolve this highly technical issue in favor of the City based upon the uncontroverted expert opinion that what was done to improve the dike was maintenance within the meaning of the 1935 easement. We conclude that there is no genuine issue of material fact that the City's recent improvements to the dike were maintenance in accordance with the 1935 plans and specifications by the USACE, or that this maintenance was necessary to protect the City and its inhabitants against flooding.

CONCLUSION

Because the City's recent improvements to the dike did not involve any land other than the land used in the original easement and because the improvements constitute maintenance within the meaning of the easement, we find that the City's improvements in 2000-2001 did not exceed the scope and limitations of the easement. For this reason, we find that the district court correctly granted summary judgment in favor of the City as to the Brutons' inverse condemnation and declaratory judgment counterclaims even though the district court's decision erroneously concluded that the 1935 easement was ambiguous. "If a trial court reaches the right result, its decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons

for its decision. The reason given by the trial court for its ruling is immaterial if the result is correct. [Citation omitted.]" *Rose v. Via Christi Health System, Inc.,* 279 Kan. 523, 525, 113 P.3d 241 (2005).

The decision of the Court of Appeals reversing the district court is reversed. The judgment of the district court is affirmed.

JOHNSON, J., not participating.
LOCKETT, J., Retired, assigned.

LUCKERT, J., dissenting: I would affirm the Court of Appeals' decision reversing the district court's order granting summary judgment to the City of Arkansas City.

In order to grant summary judgment in favor of the City, there cannot be a genuine issue of material fact related to the questions of whether the City's improvements in 2000 to the levee (1) constituted maintenance of the original dike and (2) were "in accordance with the plans and specifications" referenced in the 1935 easement. As the majority discusses, the City establishes the first requirement by offering its expert's conclusion that the 2000 improvements constituted "maintenance." The Brutons do not adequately controvert that conclusion.

The City does not, however, establish the second requirement; there remains a genuine issue of material fact regarding whether the maintenance was in accordance with the 1935 plans and specifications.

The record establishes very little about the 1935 plans and specifications. The typical sections are the only written evidence of the original contracting parties' intent regarding "plans and specifications." According to the City's consulting engineer, Typical Section No. 3 describes the placement of the levee embankment and the borrow pit and indicates that the area between the riverward toe of the levee embankment and the northern limit of the borrow pit is a seepage berm and an integral part of the levee. In other words,

the information it provides regarding plans and specifications is limited. The other source of specifications is the levee itself. The City's consulting engineer reported many of the specifications of the preimprovement structure, including features and dimensions, and explained changes in the levee system.

In the initial report from the City's consulting engineer dated August 9, 2004, as noted in some detail by the majority, the changes to the structure and the new features are explained. The improvements included adding a toe drain, raising the crest elevation of the river embankment, flattening the levee embankment slopes, adding protective material such as riprap, filling the sandpit, constructing a back-up levee, and constructing a clay-filled inspection trench along the riverside toe. It was noted that these changes were necessary because "just filling the area back to original grade" was insufficient to accomplish the purpose of the original levee. Additionally, it is noted: "In this case maintenance required constructing a backup levee . . . . Maintenance to fulfill the stated purpose of the levee is not restricted to the actual structure itself." The necessity to make these improvements in order to accomplish the *purpose* of the levee is a repeated theme in the report.

In the report dated September 8, 2004, the expert notes that the centerline of the existing levee differs from that of the 1935-36 levee system but does not cause the levee embankment to come closer to the Brutons' house. Next, the addition of the toe drain is described as a perforated pipe surrounded by filter gravel; again it is noted that the toe drain does not cause the system to use additional land beyond the original easement. Finally, many of the improvements are again detailed, with the ultimate conclusion being drawn that a new levee was not created. The improvements were "instead a concerted effort to correct the deficiencies that have threatened the city for many years by *incorporating additional features* into and onto the existing levee . . . ." (Emphasis added.) Once again, nowhere in the report does the expert conclude that these new features are in accordance with the 1935 plans and specifications. Rather, the statement repeated throughout the report is that the improvements were consistent with the *purpose* of the original easement.

The report of October 1, 2004, is similar. Improvements are described in some detail with explanations of why these improvements are necessary to insure the integrity of the levee. Repeatedly, it is emphasized that Typical Section No. 3 is the model of construction, that the improvements do not exceed the area covered by the original easement, and the work "was performed to maintain the purpose of the levee/dike." There is recognition that the assistance of Typical Section No. 3 is limited and based upon approximations. Again, there is no statement that the improvements are consistent with the 1935 plans and specifications.

Based upon these reports, in the final installment of its serial statements of uncontroverted facts, the City establishes that the improvements added .914 acres of embankment, the height increased 11 feet, and the riverside width increased 103 feet.

Never does the expert state that these improvements are consistent with the 1935 plans and specifications. Left unanswered is the question of how building a new back-up levee, adding a toe drain, raising the crest elevation, flattening the slope of the banks, adding new features, and doing all of the other improvements can be considered to be in accordance with the 1935 plans and specifications.

Despite this void, the majority concludes summary judgment is appropriate. Apparently, the majority believes that an expert opinion regarding this question is required. Yet, the majority approves summary judgment even though the City's expert, despite repeated opportunities, never specifically used the wording that the improvements are in accordance with the 1935 plans and specifications.

To reach the conclusion that the improvements are in accordance with the 1935 plans and specifications and determine that summary judgment is appropriate, the majority must weigh the facts. The majority relies upon the conclusions of the City's expert that the improvements did not exceed the footprint of the easement, did not bring the levee closer to the Brutons' house, were maintenance, and were consistent with the original purpose of the easement, *i.e.*, to prevent flooding. The majority disregards uncontroverted evidence that the improvements changed the levee's el-

evation, slope, and width and added features including a new dike. These conclusions, while factually relevant to the ultimate question of whether the improvements are in accordance with the 1935 plans and specifications, do not answer the ultimate question and that question can only be answered by weighing evidence. An issue of fact remains.

The alternative justification for granting summary judgment is to conclude that an expert opinion is required to establish that the improvements are not in accordance with the 1935 plans and specifications, and the Brutons do not offer an expert opinion. In light of the nature of the evidence in this case, such an expert opinion is not required. "[T]he well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is 'beyond the capability of a lay person to decide.' [Citations omitted.]" *Williamson v. Amrani*, 283 Kan. 227, 245, 152 P.3d 60 (2007). Lay members of a jury can determine without expert assistance whether improvements are in accordance with the plans and specifications of a structure when the improvements add approximately an acre to the bulk of a levee, raise the crest 11 feet, increase the width 103 feet, change the center line, and add new features to the original levee.

Summary judgment should have been denied. A jury should weigh the evidence and determine whether the improvements constituted maintenance in accordance with the 1935 plans and specifications.

NUSS and BEIER, JJ., join in the foregoing dissenting opinion.