NOT DESIGNATED FOR PUBLICATION

No. 128,198

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LLOYD C. CLEMENTS, as Trustee of the CLEMENTS FAMILY TRUST,
a Revocable Trust Agreement Dated 12/20/2000,
*Appellee*,

v.

CORNERSTONE RESIDENTIAL OWNERS' ASSOCIATION,
*Appellant*.

MEMORANDUM OPINION

Appeal from Butler District Court; CHARLES M. HART, judge. Oral argument held October 14, 2025. Opinion filed December 26, 2025. Affirmed.

*T. Chet Compton*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, *Timothy R. McLemore*, of T R McLemore Law Chartered, of Andover, and *David H. Farris*, of Slape and Howard Chartered, of Wichita, for appellant.

*Cody Branham*, of Adams Jones Law Firm, P.A., of Wichita, for appellee.

Before ISHERWOOD, P.J., CLINE, J., and COURTNEY D. CRAVER, District Judge, assigned.

CLINE, J.: This appeal involves a homeowner at odds with his homeowners association about the condition of his property during the construction of his home. We certainly understand the Association's frustration with Clements' extended delay in finishing his home and installing a lawn. But we find substantial competent evidence supports the district court's finding that Clements violated none of the Association's covenants. We therefore affirm the district court's judgment and award Clements his attorney fees on appeal.

1

FACTUAL AND PROCEDURAL BACKGROUND

Clements owns a lot (the Lot) in a neighborhood governed by the Cornerstone Residential Owners' Association (the Association). The Lot is encumbered by restrictive covenants set forth in a Declaration of Covenants, Conditions, Restrictions, Disclosures and Easements of The Cornerstone recorded with the Butler County Register of Deeds.

Around 2014, Clements began constructing a home on the Lot. The construction continued, and a couple of years later Clements moved to Colorado. By January 2024, the home was still under construction and no one had occupied it.

During this construction, Clements did not plant or otherwise install a lawn on the Lot. Beginning in 2019, the Association started sending Clements letters directing him to finish the home's exterior and "complete [his] yard." The Association reminded Clements that his home was subject to the Declaration's covenants and cited Section 5.01, a section within the Declaration covering maintenance, as to why it believed him to be noncompliant. Section 5.01 states, in part:

> "Each Owner . . . shall keep all Lots owned by such Owner and all improvements therein or thereon in good order, condition and repair, including, but not limited to, seeding or sodding grass, watering, fertilizing, weed control, mowing of all lawns . . . all in a manner and with such frequency as is consistent with good property management in relation to a quality residential neighborhood such as will exist in the Lots."

Eventually, the Association told Clements it was assessing fines of $100 per day against him for violating Section 5.01, since he had not completed the home's exterior nor installed a yard. In March 2021, the Association filed a Notice of Lien for Fines with the Butler County Register of Deeds against the Lot. The lien totaled $14,617 at that time and stated it would continue to increase by $100 per day.

In June 2022, Clements filed a declaratory judgment action against the Association, seeking to declare the fines invalid, to release the lien, and for attorney fees under K.S.A. 2021 Supp. 58-4621(a). Clements claimed he had not violated the Declaration because Section 7.22, the section entitled "Requirement to Plant Lawn," stated that an owner had 90 days after occupancy of a residence on a lot to plant or sod a lawn. Clements pointed out the Declaration contains no deadline for the completion of home construction. He explained the home on the Lot was still under construction and unoccupied, so his obligation to install a lawn had not been triggered.

At the bench trial in January 2024, Clements testified that, for a variety of reasons, the construction of the home was not yet finished, including the exterior, and it had yet to be occupied. He admitted he had not installed a lawn but claimed that he maintained and overseeded the Lot during construction to prevent erosion. He also explained that he sprayed for weeds on the Lot and paid a third party to mow the native grass. The Association's manager testified that Clements needed to finish the home's exterior and install a yard to bring the Lot into compliance with Section 5.01 of the Declaration.

At the end of the trial, the district court requested proposed findings of fact and conclusions of law from the parties. The court ultimately found in favor of Clements and ended up adopting Clements' proposed findings of fact and conclusions of law as its journal entry. The court determined the Association's contention that the Lot violated Section 5.01 of the Declaration was unreasonable. It concluded the Association was attempting to use Clements' general obligation to maintain the Lot under Section 5.01 as a "veiled means to coerce" Clements to finish construction of the home, which would then trigger his obligation to install a lawn under Section 7.22. It also found the evidence showed Clements had taken action to maintain the Lot during the home's construction. It declared the fines invalid and unenforceable and ordered the Association to release its lien. It also awarded Clements his attorney fees. The Association appeals this decision.

The parties seem to agree this dispute hinges on how the Declaration is interpreted. The Association contends the evidence showed that Clements violated Section 5.01 and that Section 7.22 is irrelevant. Clements, on the other hand, contends the district court's finding that he did not violate Section 5.01 is supported by substantial competent evidence. He also asserts that the Association cannot selectively enforce Section 5.01 while ignoring the provisions of Section 7.22.

*We apply contract rules of interpretation to determine the Declaration's meaning.*

The first thing we must decide is what the Declaration required of Clements under the circumstances. Since the Declaration is essentially a contract between lot owners and the Association, we apply the same rules that we use to interpret contracts to determine the meaning of the Declaration. *North Country Villas Homeowners Ass'n v. Kokenge*, 38 Kan. App. 2d 254, 260, 163 P.3d 1247 (2007). That is, we try to figure out what the parties intended the Declaration's provisions to mean by looking at the language they chose to use. See *Russell v. Treanor Investments*, 311 Kan. 675, 680, 466 P.3d 481 (2020). In doing so, we view the Declaration in its entirety rather than looking at any provision in isolation. *City of Arkansas City v. Bruton*, 284 Kan. 815, 832-33, 166 P.3d 992 (2007). And because we use a de novo standard of review for contracts, we are not bound by the district court's interpretation of the Declaration. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

When the contract terms are clear, we can ascertain the parties' intent directly from the language used without resorting to interpretive rules. *Russell*, 311 Kan. at 680. This means we simply enforce the plain language of a contract as it is written unless the text reasonably supports "two or more possible meanings." *Zukel v. Great West Managers, LLC*, 31 Kan. App. 2d 1098, Syl. ¶ 3, 78 P.3d 480 (2003). Only when faced with a true

ambiguity—when the court is left "genuinely uncertain which one of two or more meanings is the proper meaning"—do we turn to rules of construction or other evidence of the parties' intent. *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, Syl. ¶ 4, 179 P.3d 1104 (2008); see *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

*Section 7.22 of the Declaration states when an owner must plant or sod a lawn, and Section 5.01 governs the maintenance of it.*

The Declaration contains a comprehensive set of rules governing the use and maintenance of lots within the Cornerstone neighborhood. Section 5.01, titled "Covenants for Maintenance; Enforcement," states in relevant part:

> "Maintenance. Each Owner . . . shall keep all Lots owned by such Owner and all improvements therein or thereon in good order, condition and repair, including, but not limited to, seeding or sodding grass, watering, fertilizing, weed control, mowing of all lawns, the pruning and trimming of all trees and shrubbery, removal of diseased or dead trees within a reasonable time, weeding of plant beds, the painting, maintenance, repair and replacement, (including the painting or other appropriate exterior care) of all Structures, buildings and other improvements, roofs, gutters, downspouts, exterior building surfaces and other exterior improvements, any enclosed courtyards, decks, exterior doors, windows, glass walls, chimney flues, and structural items, as well as the patio, patio fence, fence or wall, if any, driveways and sidewalks appurtenant to such Lot, all in a manner and with such frequency as is consistent with good property management in relation to a quality residential neighborhood such as will exist in the Lots. Each Owner of a Lot shall maintain the grass areas within street right-of-ways adjoining such Owner's Lot, by watering such area and the regular mowing thereof. . . . Each Owner's obligation hereunder shall commence upon the acquisition of such Owner's Lot. "

The Declaration defines the "'Owner'" as the record owner of any lot in the Cornerstone neighborhood.

Section 7.22, titled "Requirement to Plant Lawn," states:

"Requirement to Plant Lawn. Within ninety (90) days after occupancy of a residence on a Lot, the Owner thereof shall plant or sod the entire lawn unless it is not seasonal to do so within such period in which event the planting or sodding shall occur as soon as reasonably possible in the next following planting season. In the event such lawn is not so installed, Declarant may, after giving written notice to any Owner of such Owner's failure to comply herewith, at any time after fifteen (15) days have expired from the date of such notice, install said lawn, and collect from such Owner the cost thereof. Declarant is hereby granted the right to enter upon any such Lot for the purpose of performing same."

The Declaration defines "'Declarant'" as the original owner of the lots in the Cornerstone neighborhood, or "its successors and assigns".

Neither party asserts that the Declaration is ambiguous. All the same, having two provisions that address lawncare—Section 5.01 mentions "seeding or sodding grass" and Section 7.22 includes a requirement to "plant or sod the entire lawn"—creates some confusion. So we must apply interpretive rules to better understand the meaning of the Declaration.

To begin, as with any contract, we cannot look at any provision of the Declaration in a vacuum. See *City of Arkansas City*, 284 Kan. at 832-33. Nor can we interpret the Declaration in a way that renders any provision or language meaningless. *Harding v. Capitol Federal Savings Bank*, 65 Kan. App. 2d 30, 42, 556 P.3d 910 (2024), *aff'd* 321 Kan. __, 577 P.3d 553 (2025). This means we must consider both provisions and attempt to harmonize them.

Turning to the provisions at issue, we note that Section 5.01, which covers lot maintenance, generally directs owners to keep their lots and any associated improvements "in good order, condition and repair." It provides examples of how owners can do this,

6

using language which seems to address caretaking of existing items. That is, if the lot has trees, then the owner must keep those trees pruned and trimmed. If the lot has plant beds, then they must be kept weeded. If the lot has structures, then they must be kept maintained and repaired. And if the lot has a lawn, then it must be kept seeded or sodded, watered, fertilized, mowed, and any weeds controlled.

Indeed, Black's Law Dictionary defines "maintenance" as: "The care and work put into property to keep it operating and productive; general repair and upkeep." Black's Law Dictionary 1139 (12th ed. 2024). Webster's New World College Dictionary similarly defines "maintenance" as: "a maintaining or being maintained; upkeep, support, defense, etc.; specif., the work of keeping a building, machinery, etc. in good repair." Webster's New World College Dictionary 880 (5th ed. 2018.) Again, these definitions appear to be directed toward existing items.

Section 7.22, on the other hand, is only concerned with the timeline to plant a lawn. This is important, because "specific provisions ordinarily qualify the meaning of the general provisions, the reasonable inference being that the specific provisions express more exactly what the parties intended." *Desbien v. Penokee Farmers Union Cooperative Association*, 220 Kan. 358, 363-64, 552 P.2d 917 (1976).

Applying these rules, we cannot concur with the Association's interpretation of Section 5.01. We find that Section 7.22 addresses when owners must install a lawn on their lot, while Section 5.01 addresses how owners must maintain that lawn once it is installed.

Accepting the Association's view of Section 5.01 would lead to an absurd result and render Section 7.22 meaningless. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963 (courts should avoid interpreting a contract provision that leads to an absurd result). If a homeowner was required to install a lawn immediately upon acquiring the lot, why

7

include a 90-day deadline after occupancy for doing so? And any lawn installed before home construction was completed would no doubt require continual repair due to construction equipment and activities. We do not believe the parties intended to unnecessarily inflate a lot owner's maintenance expenses in that way.

For these reasons, we are unpersuaded by the Association's contention that Section 5.01 required Clements to install a lawn before his home was finished. That said, the Association correctly points out that the maintenance obligations set forth in Section 5.01 "commence upon the acquisition" of the lot. In order to give meaning to this language, we recognize that Clements had some duties to maintain his lot while constructing his home—even if those duties did not yet include installation of a lawn. So we must also look at the district court's factual findings about Clements' maintenance actions and its conclusion that his actions were sufficient under Section 5.01.

*The district court's finding that Clements sufficiently maintained the Lot so as not to violate the Declaration is supported by substantial competent evidence.*

After determining the Declaration's meaning, we must now review the district court's findings that Clements did not violate it. We normally review a district court's factual findings to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. *In re Marriage of Skoczek*, 51 Kan. App. 2d 606, 607-08, 351 P.3d 1287 (2015).

The Association, however, asks us to apply a "heightened scrutiny" to the district court's findings since the court adopted Clements' proposed findings of fact and conclusions of law as its journal entry. Yet it admits the Kansas Supreme Court has found this practice, while not to be encouraged, is not inherently wrong. *Stone v. City of Kiowa*, 263 Kan. 502, 506, 950 P.2d 1305 (1997). And, as Clements notes, the Association had an opportunity to object to the district court's finding of fact and conclusions of law or

8

even move to alter or amend the district court's order if it believed the court's process in adopting Clements' proposal was improper. See K.S.A. 2024 Supp. 60-259(f). It did neither. We are therefore unpersuaded that we should review the court's findings any differently than we normally do.

As for the merits, the Association contends the Lot was not in compliance with Section 5.01 because Clements never installed a lawn. It points to Clements' admissions that he had not installed, seeded, or sodded a lawn, along with photographs of the Lot admitted at trial that show only native grasses growing on the Lot. And it alleges Section 7.22 is not relevant because the Association did not invoke this section—it invoked Section 5.01.

As explained, we take a more pragmatic view of the Declaration's requirements. So, we must examine the evidence to see whether it supports the district court's finding that Clements did not violate his maintenance obligations which, as explained, did not yet require him to plant a lawn.

Although lot owners have up to 90 days after occupying a residence on a lot to "plant or sod the entire lawn," the lot owners must still generally maintain their lot in the meantime. A review of the record shows the evidence supports the district court's finding that the Association's determination that Clements violated Section 5.01 was unreasonable. Clements testified that he took several actions to maintain his lot while the home was under construction, such as mowing native grass, spraying for weed control, and overseeding to prevent erosion. And the Association does not dispute these facts—instead, it argued Clements needed to install a yard to bring the Lot into compliance with Section 5.01. As explained, we do not find Section 5.01 to require this. But we do find it generally required Clements to maintain the Lot in the meantime, which the evidence shows he did.

9

While the Association also takes issue with the district court's determination that the Association was trying to use Section 5.01 to coerce Clements to finish construction, this finding is ultimately irrelevant. We agree with the Association that the central issue on appeal is whether it was reasonable for the Association to conclude the Lot was not compliant with Section 5.01. And, as explained, we agree with the district court that this conclusion by the Association was not reasonable. We similarly find the district court's additional conclusion that the amount of fines levied by the Association were unreasonable is irrelevant since we find the Association had no right to levy the fines under the Declaration.

In short, the district court did not err in finding it was unreasonable for the Association to require Clements to install a lawn to comply with Section 5.01. As a result, we also find the court did not err in finding the fines levied by the Association were invalid or in ordering the Association to release its lien.

*Clements is entitled to attorney fees under K.S.A. 2024 Supp. 58-4621(a) because he was the prevailing party.*

K.S.A. 2024 Supp. 58-4621(a) allows for attorney fees to be awarded to the prevailing party in a dispute between a property owner and a homeowners association. *Johnson v. Board of Directors of Forest Lakes Master Assn.*, 61 Kan. App. 2d 386, Syl. ¶ 3, 503 P.3d 1038 (2021). Since he prevailed in his action to invalidate the fees and lien, the district court awarded Clements his attorney fees and costs under K.S.A. 2024 Supp. 58-4621. The Association's only argument on this issue is that if this court reverses the district court's judgment in favor of Clements, then he is no longer entitled to attorney fees. Because we agree with the district court's findings that Clements did not violate the Declaration, we likewise affirm its decision to award Clements his attorney fees and costs.

10

Clements also moved for an award of his attorney fees on appeal under Supreme Court Rule 7.07(b) (2025 Kan. S. Ct. R. at 52). The only objection the Association lodged to Clements' request was to the $100 per hour increase in his counsel's hourly rate. But we find Clements' explanation for the increase to be sensible and the rate itself to be reasonable. We have reviewed Clements' motion, affidavit, and billing invoices and considered the factors under Rule 1.5 (a) (2025 Kan. S. Ct. R. at 326), which Clements addressed in his filings. We find the time spent and hourly rate reasonable for the work performed. We therefore grant Clements' motion for attorney fees on appeal and assess $11,001 in attorney fees against the Association for the work performed on this appeal.

Affirmed.